[Cite as *State v. Clark*, 2018-Ohio-2029.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                              Court of Appeals No. WD-17-025

　　　　Appellee                                         Trial Court No. 2014 CR 077

v.

Ronnell Clark                                             **DECISION AND JUDGMENT**

　　　　Appellant                                        Decided:  May 25, 2018

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
David T. Harold, Assistant Prosecuting Attorney, for appellee.

William V. Stephenson, for appellant.

* * * * *

**SINGER, J.**

{¶ 1} Appellant, Ronnell M. Clark, appeals from the March 16, 2017 judgment of the Wood County Court of Common Pleas, in which he was sentenced to 12 months incarceration for violating R.C. 2925.03(A)(2), (C)(3)(e), a felony of the third degree. Finding error, we reverse and remand.

## Assignments of Error

**{¶ 2}** Appellant sets forth the following assignments of error:

1) IT WAS ERROR FOR THE TRIAL COURT TO HOLD THAT IT WAS NOT A FOURTH AMENDMENT VIOLATION FOR THE POLICE TO STOP A MOTORIST FOR GOING 69 MPH IN A 70 MPH ZONE, WITH NO OTHER BASIS FOR THE STOP.

2) O.A.C. SECTION 5537-2-09 IS UNCONSTITUTIONALLY VAGUE ON ITS FACE, AND THEREFORE CANNOT LAWFULLY BE USED AS THE BASIS FOR A TRAFFIC STOP.

3) O.A.C. SECTION 5537-2-09 IS UNCONSTITUTIONALLY VAGUE AS APPLIED IN THIS CASE, AND THEREFORE CANNOT LAWFULLY BE USED AS THE BASIS FOR A TRAFFIC STOP, ON THE FACTS PRESENT IN THIS CASE.

4) IT WAS REVERSIBLE ERROR FOR THE TRIAL COURT TO FAIL TO FIND THAT THE ARRESTING OFFICER LACKED PROBABLE CAUSE TO DO AN INVESTIGATORY SEIZURE AND SEARCH OF APPELLANT.

## Facts

**{¶ 3}** On January 30, 2014, appellant was a passenger of a vehicle ("the vehicle") traveling in a three-lane section of the Ohio Turnpike. Appellant and the driver were allegedly returning to Akron from visiting their aunt in Toledo.

2.

**{¶ 4}** While traveling in the center lane, the vehicle passed a stationary highway patrol car. In that patrol car was Trooper Alejo Romero III, who testified he was observing eastbound traffic when he noticed the vehicle slowing as it passed him while in the center lane. Romero admitted that, other than the vehicle slowing down, the driver's behavior was not alarming or indicative of criminality.

**{¶ 5}** Romero proceeded to follow the vehicle closely, in an effort to pace the vehicle and determine its speed. Romero testified there was no other traffic around the vehicle, although the dash-cam video shows a car and truck close ahead of the vehicle as Romero followed. Romero testified that he paced the vehicle at about 66 to 69 m.p.h., and that the posted speed limit was 70 m.p.h.

**{¶ 6}** Romero followed for approximately one and one-half minutes before activating his patrol lights and signaling for the vehicle to pull over. Romero testified that he believed the driver of the vehicle had violated R.C. 4511.25 and Ohio Adm.Code 5537-2-09. He was only going to issue a warning. The stop occurred during daylight hours, and there was no precipitation or unusual weather conditions.

**{¶ 7}** The dash-cam video reveals the vehicle immediately complied with the signal and pulled over to the outer shoulder. Romero and another trooper, Kirk Beidelschies, exited the patrol car and approached the passenger side of the vehicle. Romero engaged in conversation with the driver and Beidelschies assessed the interior of the vehicle.

3.

{¶ 8} Romero testified he knew the vehicle was a rental, so he asked the driver for his license and the rental agreement. The driver produced both. Romero said, and the video shows, that Romero assessed the interior of the vehicle as he stood and requested and reviewed the information.

{¶ 9} Romero said he began to detect indicia of criminal activity. Specifically, Romero said he sensed a strong odor of deodorizers, which he stated was atypical of rental cars based on his experience. Furthermore, Romero said he noticed two smartphones and three flip phones, and that both the driver and appellant were visibly nervous.

{¶ 10} Romero asked the driver to step out of the vehicle, and the driver did so. Romero frisked and escorted the driver to his patrol car. Romero testified that he was only going to issue a warning at that point.

{¶ 11} Trooper Beidelschies stood and observed the driver's pat-down, and then re-approached the passenger side of the vehicle. He again seemed to be assessing the interior of the vehicle. Beidelschies questioned appellant while standing at the passenger side of the vehicle, and then returned to the patrol car to request from Romero a piece of paper to write down appellant's information because appellant had no identification. Beidelschies again approached appellant, and stood at the passenger side window conversing with appellant for about a minute.

{¶ 12} According to Romero's testimony, Beidelschies noticed "raw marijuana flakes" in the passenger door handle and requested appellant to step out of the vehicle.

4.

Appellant was then frisked and placed in the trooper car. Beidelschies proceeded to search the entire vehicle, and there were approximately 21 pounds of cannabis found in the trunk.

{¶ 13} On March 6, 2014, an indictment was filed charging appellant with possession of cannabis in violation of R.C. 2925.11(A) and (C)(3)(e), a felony of the third degree, and trafficking in cannabis in violation of R.C. 2925.03(A)(2) and (C)(3)(e), also a felony of the third degree.

{¶ 14} Appellant moved to suppress the 21 pounds of cannabis on June 26, 2015. A suppression hearing was held on October 17, 2016.

{¶ 15} At the hearing, Romero and appellant provided their testimony and the court reviewed the dash-cam video. The court further recognized and made the parties stipulate that as Romero followed the vehicle they passed both a truck and a trooper car who had pulled over another vehicle and was parked in the outer shoulder.

{¶ 16} On October 20, 2016, the trial court denied the motion to suppress. The primary rationale was that Romero had probable cause to conduct the search where the original stop was to enforce Ohio Adm.Code 5537-2-09 and R.C. 4511.25(B). The court further noted that even if Romero made a mistake in interpreting and enforcing those laws, that such a mistake would be reasonable and would not render the stop invalid. The court also determined the officers had probable cause to search the vehicle because cannabis flakes were in plain view when the officers assessed the interior of the vehicle.

5.

{¶ 17} On November 4, 2016, appellant entered a no-contest plea. The parties stipulated that the possession conviction would merge with the trafficking conviction.

{¶ 18} The court sentenced appellant to 12 months incarceration and a 6-month license suspension, with the possibility of 3 years postrelease control. The sentencing entry was journalized on March 16, 2017, and appellant timely appealed.

## Standard of Review

{¶ 19} "Appellate review of a motion to suppress presents mixed questions of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact." *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, ¶ 100. The appellate court must accept the trial court's findings of fact if supported by competent, credible evidence. *State v. Steed*, 2016-Ohio-8088, 75 N.E.3d 816, ¶ 11 (6th Dist.). A de novo standard applies to determine if the facts satisfy the applicable legal standard. *State v. Bragg*, 6th Dist. Lucas No. L-07-1162, 2007-Ohio-5993, ¶ 4.

## First Assignment of Error

{¶ 20} Appellant first argues Trooper Romero violated appellant's right against unreasonable searches and seizures when Romero stopped the vehicle for driving below the speed limit in the center lane of the Ohio Turnpike. Appellee contends Romero witnessed traffic violations under Ohio Adm.Code 5537-2-09 and R.C. 4511.25(B), and thus had cause to stop the vehicle.

{¶ 21} "The Fourth Amendment to the United States Constitution and the Ohio Constitution, Article I, Section 14, prohibit unreasonable searches and seizures." *State v.*

6.

*Emerson*, 134 Ohio St.3d 191, 2012-Ohio-5047, 981 N.E.2d 787, ¶ 15. When a police officer stops a vehicle and detains its occupants, a seizure within the meaning of those provisions has occurred. *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). Accordingly, to effectuate a traffic stop, an officer must have probable cause to believe the driver is violating a traffic or equipment regulation or there is articulable and reasonable suspicion that the vehicle or its occupant is subject to seizure for violating the law. *Id.* at 661-663.

{¶ 22} When police stop a vehicle without either probable cause or a reasonable articulable suspicion of criminal activity, the seizure is violative of constitutional rights and evidence derived from such a stop must be suppressed. *Mapp v. Ohio*, 367 U.S. 643, 655, 6 L.Ed.2d 1081, 81 S.Ct. 1684 (1961). "Both passengers and the driver have standing regarding the legality of a stopping because when the vehicle is stopped, they are equally seized, and their freedom of movement is equally affected." *State v. Carter*, 69 Ohio St.3d 57, 63, 630 N.E.2d 355 (1994).

{¶ 23} A "de minimis violation of traffic laws" is generally sufficient to justify a stop. *See State v. Dukes*, 4th Dist. Scioto Nos. 16CA3745, 16CA3760, 2017-Ohio-7204, ¶ 16; *Whren v. U.S.*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

{¶ 24} Here, appellant was a passenger in a rental vehicle which was traveling 66 to 69 m.p.h. in the center of a three-lane section of the Ohio Turnpike.

7.

**{¶ 25}** We note the Ohio Turnpike is a public highway and "Ohio laws governing the operation of motor vehicles on public highways * * * apply to the Ohio Turnpike." *State v. Koder*, 6 Ohio App.3d 61, 62, 453 N.E.2d 1116 (6th Dist.1982).

**{¶ 26}** The vehicle passed Trooper Romero's stationary police car. Romero followed and paced the vehicle, eventually signaling and effectuating a traffic stop.

**{¶ 27}** Romero's testimony at the October 17, 2016 suppression hearing reveals he was enforcing Ohio Adm.Code 5537-2-09 and R.C. 4511.25(B) when stopping the vehicle. Specifically, the transcript of the suppression hearing reflects as follows:

[Tr. Romero]: Well, there's two different rules. One of them is the Ohio Administrative Code and it's 5537-2-09 and that is travel lanes and that is as it relates to the turnpike. As I understand that rule, a driver shall stay in the right lane and shall not move from that lane unless they are passing somebody or at least going the speed limit. So as I understand that rule, if you are going below the speed limit and you are not passing anybody, you are supposed to be in the right lane. That rule also indicates that you cannot be in the far left lane at all unless you are passing. So even if you are going below the speed limit or above the speed limit or anything, you can't be in the far left lane at all unless you are passing.

[Prosecutor]: Is that any different than the Ohio Revised Code?

[Tr. Romero]: The Ohio Revised Code— and that's— I think that section is entitled Lanes of Travel. That is 4511.25 and subsection B. It

8.

indicates that a driver shall stay in the right lane and shall not deviate unless they are turning left or passing.  So it doesn't indicate anything about speed as the Ohio Administrative Code does.

[Prosecutor]:  And were you familiar with those— that Administrative Code and that statute back on January 30th of 2014?

[Tr. Romero]:  Yes, sir.  That was the reason for the stop.

* * *

{¶ 28} Ohio Adm.Code 5537-2-09 provides:

The operator of a motor vehicle shall drive in the outer and center traffic lanes in the designated direction for traffic, except when lawfully crossing from one lane to another.  The operator of a motor vehicle shall use the inner traffic lanes for passing only.  Where three traffic lanes are provided for the same direction of travel, heavy commercial vehicles and vehicles operated at a rate of speed below the maximum in effect shall drive in the outer lane and shall use the center lane for passing only.

{¶ 29} R.C. 4511.25(B), in pertinent part, provides:

(1) Upon all roadways any vehicle or trackless trolley proceeding at less than the prevailing and lawful speed of traffic at the time and place and under the conditions then existing shall be driven in the right-hand lane then available for traffic, and far enough to the right to allow passing by

faster vehicles if such passing is safe and reasonable, except under any of the following circumstances:

> (a) When overtaking and passing another vehicle or trackless trolley proceeding in the same direction;

> (b) When preparing for a left turn;

> (c) When the driver must necessarily drive in a lane other than the right-hand lane to continue on the driver's intended route.

*See* R.C. 4511.25(B)(1)(a)-(c).

{¶ 30} In this case, and based on review of the language of Ohio Adm.Code 5537-2-09 and R.C 4511.25(B)(1), we find the regulation improperly adds an element of speed to the statute.

{¶ 31} More specifically, and with regard to what speed triggers the duty to drive in the far-right lane, R.C 4511.25(B)(1) states: "less than the prevailing and lawful speed of traffic at the time and place and under the conditions then existing[;]" whereas, Ohio Adm.Code 5537-2-09 states: "below the maximum in effect."

{¶ 32} These triggering speeds are inconsistent where "the maximum in effect," *id.*, is actually intended to mean the posted speed limit. R.C. 4511.25 does not restrict use of the center lane on a three-lane highway to only traveling at the exact rate indicated by the posted speed limit, because it only requires a driver to be in the far-right lane when he or she is not traveling at a rate of speed comparable to other reasonable and lawful drivers at that time and under those conditions.

10.

{¶ 33} Based on review of the record, including the dash-cam video and testimony of Romero and appellant, we find no competent, credible evidence to support the claim that the vehicle appellant was in was traveling "less than the prevailing and lawful speed of traffic at the time and place and under the conditions then existing." *See* R.C. 4511.25(B)(1); *accord State v. Huth*, 133 Ohio App.3d 261, 727 N.E.2d 931 (7th Dist.1999) (enforcing statute where driver impeded flow of traffic by remaining in left lane of multi-lane highway while other vehicles passed to the right.).

{¶ 34} We, therefore, reject Romero's claim that the vehicle was operated in violation of R.C. 4511.25(B) before he stopped it.

{¶ 35} Romero stated the vehicle traveled between 66 and 69 m.p.h. as he paced behind and observed it. Our review of the video reflects other vehicles not only traveled in the center lane ahead of the trooper and vehicle, but also that those other vehicles were traveling at a comparable rate of speed. Thus, we find the vehicle appellant was in traveled at the prevailing speed of traffic comparable to other reasonable and lawful drivers, at that time and under those weather conditions, in compliance with R.C. 4511.25(B)(1).

{¶ 36} Consequently, our review of whether Romero had reason to stop appellant solely regards whether the vehicle was operated in violation of Ohio Adm.Code 5537-2-09.

{¶ 37} However, we will not reach and address this particular issue because we determine that Ohio Adm.Code 5537-2-09 is invalid where it conflicts with R.C

11.

4511.25(B)(1). In particular, we find they both cover the same subject matter, and that Ohio Adm.Code 5537-2-09 improperly adds to the law provided in R.C. 4511.25(B)(1).

{¶ 38} "Administrative rules are designed to accomplish the ends sought by the legislation enacted by the Ohio General Assembly." *GMS Mgt. Co. v. Ohio Civ. Rights Comm.*, 2016-Ohio-7486, 64 N.E.3d 1025, ¶ 16 (8th Dist.). Therefore, "rules promulgated by administrative agencies are valid and enforceable unless unreasonable or in conflict with statutory enactments covering the same subject matter." *State ex rel. Curry v. Indus. Com. of Ohio*, 58 Ohio St.2d 268, 269, 389 N.E.2d 1126 (1979). *See also Ellis v. Ohio Turnpike Com.*, 162 Ohio St. 86, 120 N.E.2d 719 (1954), paragraph one of the syllabus ("The Ohio Turnpike Commission is a statutory body and possesses only such authority and powers as are conferred on it by enactments of the General Assembly.").

{¶ 39} Further, an administrative regulation "may not add to or subtract from" the legislative enactment. *See Cent. Ohio Joint Vocational School Dist. Bd. of Edn. v. Admr., Ohio Bur. of Emp. Servs.*, 21 Ohio St.3d 5, 10, 487 N.E.2d 288 (1986). "If it does, the rule clearly conflicts with the statute, and the rule is invalid." *See State ex rel. Am. Legion Post 25 v. Ohio Civ. Rights Comm.*, 117 Ohio St.3d 441, 2008-Ohio-1261, 884 N.E.2d 589, ¶ 14.

{¶ 40} As an example of a regulation invalidated for being inconsistent with a statute, we point to *Hoffman v. State Med. Bd.*, 113 Ohio St.3d 376, 2007-Ohio-2201, 865 N.E.2d 1259. In *Hoffman*, the Supreme Court of Ohio ("the *Hoffman* court") held Ohio

12.

Adm.Code 4731-24-04(A) was invalid because it conflicted with R.C. 4760.09. *Id.* at

paragraph one of the syllabus. Ohio Adm.Code 4731-24-04(A) was adopted by the State

Medical Board of Ohio ("the Board") under the authority given in R.C. 4760.19, which

states:

> The state medical board may adopt any rules necessary to govern the
>
> practice of anesthesiologist assistants, the supervisory relationship between
>
> anesthesiologist assistants and supervising anesthesiologists, and the
>
> administration and enforcement of this chapter. Rules adopted under this
>
> section shall be adopted in accordance with Chapter 119. of the Revised
>
> Code.

**{¶ 41}** At that time, Ohio Adm.Code 4731-24-04(A)(2007) stated:

> Nothing in this chapter of the Administrative Code or Chapter 4760.
>
> of the Revised Code shall permit an anesthesiologist assistant to perform
>
> any anesthetic procedure not specifically authorized by Chapter 4760. of
>
> the Revised Code, including epidural and spinal anesthetic procedures and
>
> invasive medically accepted monitoring techniques. For purposes of this
>
> chapter of the Administrative Code, 'invasive medically accepted
>
> monitoring techniques' means pulmonary artery catheterization, central
>
> venous catheterization, and all forms of arterial catheterization with the
>
> exception of brachial, radial and dorsalis pedis cannulation.

13.

**{¶ 42}** The Board argued this regulation was valid, and that it explicitly prohibited anesthesiologist assistants from performing epidural and spinal anesthetic procedures. *Id*. at ¶ 3. The appellant, Joseph Hoffman, a certified anesthesiologist's assistant, argued the regulation conflicted with R.C. 4760.09, which lists the authorized activities of anesthesiologist assistants. *Id*. at ¶ 4.

**{¶ 43}** The Board pointed to the legislative history of the statute to support that no conflict existed. The Board argued that the legislature did not intend to allow assistants to perform the procedures, and the argument hinged on the meaning of the word "assist" in the statute. *Id*. at ¶ 18.

**{¶ 44}** Hoffman, to the contrary, argued that use of the word "assist" was to allow assistants to "insert the needle under the direct supervision of the anesthesiologist during epidural or spinal anesthetic procedures." *Id*.

**{¶ 45}** The *Hoffman* court agreed the outcome depended on the meaning of the word "assist." *Id*. at ¶ 19. In analyzing the meaning, the court determined "assist" meant "[t]o carry out procedures as requested by the supervising anesthesiologist." *Id*. at ¶ 25. The court then stated that "[b]ecause the administrative rule prohibits anesthesiologist assistants from performing procedures that the statute permits, the rule clearly conflicts with the statute[.]" *Id*. at ¶ 34. The regulation was held to be invalid and, thus, unenforceable. *Id*. at ¶ 36.

**{¶ 46}** Here, Romero's interpretation of Ohio Adm.Code 5537-2-09 requires that only those cars traveling exactly 70 m.p.h. may use the center lane of a three-lane

14.

highway (assuming 70 m.p.h. is the posted speed limit). Anyone traveling 69 m.p.h. or under in that center lane, where the posted limit is 70 m.p.h., hence, is subject to being stopped pursuant to this regulation unless he or she is actively passing or overtaking another vehicle.

{¶ 47} R.C. 4511.25(B) does not have this strict speed requirement. Even Romero recognized this twice in open court. First, he responded in the negative to a question of whether speed was relevant to R.C. 4511.25(B). Second, he testified R.C. 4511.25(B) "doesn't indicate anything about speed as the Ohio Administrative Code does."

{¶ 48} Consistent with the law governing statutory preemption of administrative regulations as articulated in *Hoffman*, we find the traffic stop here was neither based on a violation of law nor on a valid and enforceable regulation. *See Koder*, 6 Ohio App.3d at 63, 453 N.E.2d 1116 (stating "R.C. 5537.16 authorizes the Turnpike Commission to issue regulations preempting the Revised Code with respect to speed limits, axle loads, vehicle loads and vehicle dimensions[,]" but recognizing such authorization is limited to dealing with problems not dealt with by the Revised Code).

{¶ 49} Accordingly, appellant's first assigned error is found well-taken and, although this holding is ground to reverse, we review and address the remaining assigned errors.

### Second and Third Assignments of Error

{¶ 50} Appellant next argues Ohio Adm.Code 5537-2-09 cannot be used as a basis for a traffic stop where it is unconstitutionally vague on its face and as applied in this

15.

case.  Appellee argues Ohio Adm.Code 5537-2-09 is constitutional because it clearly and precisely prohibits certain conduct, and because the driver of the vehicle was not deprived of fair warning.

{¶ 51} We initially note that under federal constitutional law, "[i]t is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand."  *United States v. Mazurie*, 419 U.S. 544, 550, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975).  Therefore, we dispose of the second assigned error and only address the third.

{¶ 52} "Under the tenets of due process, an ordinance is unconstitutionally vague under a void-for-vagueness analysis when it does not clearly define what acts are prohibited under it."  *Viviano v. City of Sandusky*, 2013-Ohio-2813, 991 N.E.2d 1263, ¶ 13 (6th Dist.), citing   *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *State v. Tanner*, 15 Ohio St.3d 1, 472 N.E.2d 689 (1984); *Norwood v. Horney*, 110 Ohio St.3d 353, 2006-Ohio-3799, 853 N.E.2d 1115.

{¶ 53} A law is vague in this manner when it "trap[s] the innocent by not providing fair warning."  *Viviano* at ¶ 13, citing *Grayned* at 108.

{¶ 54} To pass muster under this doctrine, an administrative regulation must survive the tripartite analysis set forth in *Grayned*.  *See*, *e.g.*, *State v. Whites Landing Fisheries, LLC*, 2017-Ohio-4021, 91 N.E.3d 315, ¶ 16 (6th Dist.); *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 239; *In re Jim's Sales, Inc.*, 9th Dist.

16.

Lorain No. 04CA008601, 2005-Ohio-4086, ¶ 20-21; *State v. White*, 3d Dist. Marion No. 9-96-66, 1997 Ohio App. LEXIS 1598, *11 (Mar. 28, 1997).

**{¶ 55}** The three prongs are: (1) the regulation must provide fair warning to the ordinary citizen of what conduct is proscribed, (2) the regulation must preclude arbitrary, capricious, and discriminatory enforcement, and (3) the regulation must not impinge constitutionally protected rights. *See Viviano* at ¶ 15, citing *Grayned* at 108-109.

**{¶ 56}** Under the first prong of *Grayned*, a regulation must be comprehensible to a person of ordinary intelligence, to the extent that it would inform such a person what conduct is prohibited. *Viviano* at ¶ 16. As applied, the regulation thus must have been comprehensible to the driver of the vehicle in which appellant was, to the extent that it would inform the driver what conduct is prohibited.

**{¶ 57}** At issue here is the language of Ohio Adm.Code 5537-2-09, *supra*. As articulated above, we find the regulation prohibits vehicles from traveling at a speed below the posted limit, in the center lane of a three-lane roadway, unless the vehicle is passing and overtaking another vehicle to its right. Although we find Ohio Adm.Code 5537-2-09 indicates what is prohibited, we are yet concerned as applied to the particular facts of appellant's case.

**{¶ 58}** Specifically, we find that a large traffic sign was located within a reasonable distance from where the vehicle was stopped. *See* Ohio Adm.Code 5537-2-02 ("No person shall fail to comply with any traffic-control sign, signal, marking or device, unless otherwise directed by a police officer."); R.C. 4511.12(A) ("No pedestrian, driver

17.

of a vehicle, or operator of a streetcar or trackless trolley shall disobey the instructions of any traffic control device[.]").

{¶ 59} The sign at issue requests trucks and slower traffic to use the right two lanes. *See* R.C. 4511.351(B) ("The director of transportation shall erect 'keep right except to pass' signs along the right-hand roadway of a freeway that consists of at least three lanes and is part of the interstate system."). There are two arrows pointing and directing such drivers to stay in these lanes. Appellant saw the sign, although he could not confirm the driver did. The same type of sign was visible in the dash-cam video, on the opposite side of the turnpike, after appellant was placed in the trooper car and arrested. We find this sign would certainly cause confusion with regard to, and even contradict, the regulation promulgated in Ohio Adm.Code 5537-2-09.

{¶ 60} Moreover, there was evidence in the record showing the vehicle actually passed another car and, as stipulated to in open court, also passed an active traffic stop while driving in the center lane and being followed by Romero. *See* R.C. 4511.213(A)(1),(C) (requiring drivers, if possible, to "change lanes into a lane that is not adjacent to that of the stationary public safety vehicle").

{¶ 61} Consequently, we find the various applicable laws and directive in the sign, under the circumstances, would certainly cause confusion as to what conduct is proscribed. Accordingly, appellant's third assignment of error is well-taken.

18.

## Fourth Assignment of Error

{¶ 62} Appellant's last argument is that despite whether the traffic stop was lawful the subsequent investigatory search and seizure of appellant were unconstitutional because the arresting officers were on a fishing expedition. Appellee contends the arresting officers noticed indicia of criminal activity subsequent to making the stop and, thus, had reasonable, articulable suspicion to conduct the search and make the seizure.

{¶ 63} As stated in our analysis of the first assigned error, we find Trooper Romero did not have a lawful basis to stop the vehicle. Nevertheless, we address this fourth assigned error and find another ground to reverse.

{¶ 64} The lawfulness of an investigatory stop is governed by *Terry v. Ohio*, 392 U.S. 1, 20 L.Ed.2d 889, 88 S.Ct. 1868 (1968).

{¶ 65} In *State v. Williams*, 51 Ohio St.3d 58, 60-61, 554 N.E.2d 108 (1990), the Supreme Court of Ohio stated that "in order to warrant a brief investigatory stop pursuant to *Terry*, the police officer involved must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.*, citing *Terry* at 21.

{¶ 66} Such an investigatory stop "must be viewed in light of the totality of the surrounding circumstances presented to the police officer." *State v. Freeman*, 64 Ohio St.2d 291, 414 N.E.2d 1044 (1980), paragraph one of the syllabus. The standard for reviewing such conduct is an objective one: "would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief

19.

the action taken was appropriate?" *Terry*, *supra*, at 21-22; *United States v. Wright*, 565 F.2d 486, 489 (8th Cir.1977). That is, "an investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417, 66 L.Ed.2d 621, 101 S.Ct. 690 (1981). The officer must be able to articulate something more than an inchoate and unparticularized suspicion or hunch that something is wrong. *State v. Rivera*, 6th Dist. Lucas No. L-04-1369, 2006-Ohio-1867, ¶ 18, citing *Terry* at 27, and *Alabama v. White*, 496 U.S. 325, 329, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990).

{¶ 67} "An officer's intuition, even if ultimately confirmed, will not provide a constitutional basis for an investigatory stop." *Id.*, citing *State v. Mesley*, 134 Ohio App.3d 833, 840, 732 N.E.2d 477 (1999).

{¶ 68} In this case, appellee specifically argues the arresting officers had reasonable suspicion illegal activity was occurring because: (1) appellant was in a rented vehicle when pulled over; (2) there were two smartphones and three "flip phones" in the vehicle; (3) appellant and the driver were nervous; (4) the vehicle smelled of strong deodorizers; (5) the driver provided vague answers to questions from the officer; and, (6) there were "marijuana flakes" inside the vehicle in plain view.

{¶ 69} We have reviewed the dash-cam video and testimony in the record, and note that aside from Romero's testimony, there is no additional competent, credible evidence to corroborate that "marijuana flakes" were inside the vehicle and in plain view. Trooper Beidelschies did not testify at the suppression hearing, and there was no

20.

evidence in the record in the form of pictures, chemical testing, reported scent of the flakes, or otherwise, to support that any plant "flakes" seen by Beidelschies were indeed an illicit drug.

{¶ 70} Nevertheless, even had the cannabis flakes been present, we cannot say this alone would be sufficient to allow a custodial search of any driver, passenger, or vehicle (so long as R.C. 2935.26 did not otherwise apply under the circumstances) because that amount of drugs would only be a minor misdemeanor. *See*, *e.g.*, *State v. Grubbs*, 2017-Ohio-41, 80 N.E.3d 1075, ¶ 36-44 (6th Dist.).

{¶ 71} In *Grubbs*, we held that under the totality of the circumstances an officer was not justified in searching Grubbs for a minor misdemeanor offense because the search was not in compliance with R.C. 2935.26. *Id*. at ¶ 36. In that case, this court reached that conclusion despite testimony from the officer that, as he approached the vehicle after a properly initiated traffic stop, he smelled cannabis, and he saw cash, a pipe, a straw with white powder residue, a pill and pill bottle, and cannabis "roaches" and flakes. *Id*. at 37-38. We determined that only a citation should have been given, not a full custodial search. *Id*. at 43.

{¶ 72} Therefore, consistent with *Grubbs*, even if we were to find the vehicle was properly stopped under either Ohio Adm.Code 5537-2-09 or R.C. 4511.25(B) in this case, the totality of the circumstances suggest Troopers Romero and Beidelschies were not justified in searching the driver, car or appellant for the alleged minor misdemeanors. *See* Ohio Adm.Code 5537-7-01; R.C. 4511.25(D).

21.

{¶ 73} Appellee lastly argues that, despite whether the investigatory search was unconstitutional, exceptions to the warrant requirement apply to allow admissibility of any otherwise tainted evidence.

{¶ 74} "Warrantless searches are per se unreasonable." *State v. Belcher*, 2d Dist. Montgomery No. 24385, 2011-Ohio-5015, ¶ 39, citing *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). "Warrantless searches and seizures are not illegal, however, if one of the several exceptions to the Fourth Amendment's warrant requirement is demonstrated." *Id.*

{¶ 75} The first exception appellee applies is the independent source rule, which provides that "evidence observed by police during an illegal entry need not be excluded if the evidence is later discovered during the execution of a valid search warrant issued on information wholly unconnected to the prior entry." *Carter*, 69 Ohio St.3d at 68, 630 N.E.2d 355. Generally, the requirements are: "(1) no information presented in the affidavit for the warrant was seen during the initial entry, and (2) the agents' decision to seek the warrant was not prompted by what they had seen during the initial entry." *Id.*

{¶ 76} Here, no warrant was ever sought by the arresting officers. Nevertheless appellee claims that, when considered along with the plain view doctrine, the independent source rule applies and the evidence should not be excluded. Appellee points to *State v. McLaughlin*, 6th Dist. Erie No. E-12-073, 2014-Ohio-1150.

{¶ 77} In *McLaughlin*, we held evidence should not be excluded because "[the officer] seized the evidence in the car pursuant to the plain view doctrine, independent of

22.

the stop and pat down of appellant[.]" *Id*. at ¶ 16. McLaughlin was seen in a public parking lot, by an anonymous tipster who believed he was involved in a drug transaction. The tipster called in a complaint and the officer responded and approached McLaughlin. McLaughlin was no longer in the parking lot, however, his vehicle was running, unattended and parked on a public street. A pat down ensued and nothing was found on McLaughlin's person. However, the officer began shining his flashlight in the general area to see if any contraband had been discarded. The officer also shined his light into McLaughlin's vehicle and noticed "packages of marijuana on the center console." *Id*. at ¶ 3. A subsequent search of the vehicle revealed two cellphones and over $6,000 in cash.

{¶ 78} McLaughlin's trial counsel did not move to suppress any evidence, and on appeal McLaughlin claimed this was ineffective assistance. *Id*. at ¶ 9. We disposed of the claim because we found he would not have been successful in suppressing the evidence. Our rationale was based on the plain view doctrine. However, appellee now argues the independent source rule was implicated because we stated that the officer "discovered the evidence in the car by means unrelated to the initial stop and pat down of appellant." *Id*. at ¶ 13. We did not consider the constitutionality of the stop and pat down. *Id*. at ¶ 16.

{¶ 79} We can distinguish *McLaughlin* from the case here, however. More specifically, we find in *McLaughlin* there was an anonymous tip, and the perpetrator's vehicle was parked in a parking lot and along a public street. Whereas, appellant here was traveling in a vehicle along a highway and there was no anonymous tip to give rise to

23.

reasonable suspicion or probable cause. Romero testified there was no tip prior to stopping the vehicle.

{¶ 80} The second exception appellee applies is the inevitable discovery doctrine, which provides that "illegally obtained evidence is properly admitted in a trial court proceeding once it is established that the evidence would have been ultimately or inevitably discovered during the course of a lawful investigation." *State v. Lewis*, 6th Dist. Lucas Nos. L-09-1224, L-09-1225, 2010-Ohio-4202, ¶ 48, quoting *State v. Perkins*, 18 Ohio St.3d 193, 480 N.E.2d 763 (1985), syllabus. "[T]he state must show that there is a high degree of probability that police would have discovered the derivative evidence apart from the unlawful conduct." *Id.*, citing *Perkins* at 196.

{¶ 81} Here, we have determined both the stop and subsequent search of the vehicle and seizure of appellant were unconstitutional. Without the illegal stop, search and seizure, we are not sure how the drugs found would have been inevitably discovered.

{¶ 82} Accordingly, we find appellant's fourth assignment of error well-taken.

**Conclusion**

{¶ 83} The March 16, 2017 judgment of the Wood County Court of Common Pleas is reversed. This cause is remanded to the trial court for further proceedings consistent with this judgment. Appellee is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment reversed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Arlene Singer, J.

Thomas J. Osowik, J.

Christine E. Mayle, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.