**[Cite as *State v. Marshall*, 2022-Ohio-1533.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                         Court of Appeals No.  WD-21-043

        Appellee                                  Trial Court No.  2020CR0210

v.

Charles Marshall, J.                          **DECISION AND JUDGMENT**

        Appellant                                  Decided:  May 6, 2022

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
David T. Harold, Assistant Prosecuting Attorney, for appellant.

Michael H. Stahl, for appellee.

* * * * *

**DUHART, J.**

**{¶ 1}** Appellant, the State of Ohio ("the state"), appeals from a judgment entered by the Wood County Common Pleas court granting a motion to suppress evidence that was filed by appellee, Charles Marshall.  For the reasons that follow, we affirm the trial court's judgment.

**Statement of the Case**

{¶ 2} Appellee was indicted on June 11, 2020, in a two count indictment. Count one charged him with trafficking in cocaine, and count two charged him with possession of cocaine. Both counts were charged as felonies of the third degree, based upon the amount of the drug that was involved.

{¶ 3} On March 8, 2021, appellant filed a motion to suppress evidence and, soon after, he filed an amended motion to suppress. A suppression hearing was held on April 22, 2021. The state called Sgt. Mark Marek and Det. Craig Revill, both of whom were with the Rossford Police Department, to testify. Following the hearing, the trial court ordered further briefing. The state filed its memorandum in opposition to the motion to suppress on May 7, 2021. Appellee filed his response on May 17, 2021, and the state filed a reply on May 21, 2021.

{¶ 4} In a judgment entry dated June 24, 2021, the trial court granted appellee's motion to suppress, ordering that "all evidence obtained as a result of the search of Defendant's hotel room on December 18, 2019 and any evidence derived from that illegal seizure is suppressed and not admissible at the trial of this matter * * * ." It is from this judgment that the state now appeals.

**Statement of the Facts**

{¶ 5} The trial court's findings of fact, clearly stated and amply supported by competent, credible evidence, are set forth in the June 24, 2021 judgment entry as follows:

Mr. Marshall's foray into the criminal justice system began with a 911 call from the Knights Inn located at 1120 Buck Road in Rossford, Ohio. The information the court used in putting this recitation of facts together came from testimony of Sgt. Mark Marek and Det. Craig Revill, listening to the recording of the 911 call provided as an exhibit, and reviewing video offered as evidence taken from Sgt. Marek's bodycam.

The 911 call came to the Rossford Police and Fire dispatch at approximately 1:42 p.m. on December 18, 2019. The first voice on the recorded call is from an unknown person stating that he has an emergency. He then hands the phone to a member of the housekeeping staff. At first this confuses the dispatcher because there has been no statement as to where the call is coming from or who has initiated the call.

Once on the phone the housekeeper began her recitation of the facts as if the dispatcher should know where she is calling and that she is a housekeeper. In this recitation she informed the dispatcher that she went into a room and was cleaning up. She stated that she began picking up personal belongings of the occupant because he was supposed to be checking out and she believed he had left without taking his clothes or other personal items. She said that she had announced herself and no one had answered. But after being in the room a few minutes she went into the

3.

bathroom where she discovered the occupant of the room, the Defendant in this case, was unresponsive and moaning in the bathtub.

After all this information was conveyed the housekeeper informed the dispatcher that she is calling about room 305 at the Knights Inn, after a question was asked by the dispatcher. The answer to this question confirmed that the caller is with the cleaning crew at Knights Inn, that there is a man in the bathtub of room 305, and that he is unresponsive. The dispatcher closed out the call, which lasted just over 2 minutes, with collecting the housekeeper's name * * * and informing her that they will be sending help to the occupant of that room.

Within minutes of this call Sgt. Mark Marek of the Rossford Police Department drove his police cruiser into the Knights Inn parking lot and parked in a space across from room 305. The hotel is a single-story complex with rooms that have outdoor entrances. At the same moment a rescue squad from Rossford Fire Department arrived and paramedics from that truck walked toward the room. Sgt. Marek informed the paramedics that "they're asking for Narcan." This information had come to the sergeant via radio communication from an officer who was inside the hotel room. The Rossford police chief and a trainee officer had arrived at the hotel moments ahead of Sgt. Marek and the rescue squad and were already inside the room.

4.

Three paramedics from the rescue squad entered into room 305 followed by Sgt. Marek. The paramedics went directly to the bathroom. The room is approximately 10-13 feet wide and 20-25 feet long with a bathroom vanity at the far end of the room. To the left of this vanity is a door which leads to the bathroom where the toilet and bathtub are located. From the video it can be seen that this room has a single bed which appears to be queen or king sized. On each side of the bed are nightstands. To the left of the entry door is a table with two chairs in front of a window that is next to the entry door. To the right and facing the bed is a table with a flat screen television.

In the video one can see the police chief standing against a wall at the far end of the room near the bed. Another emergency worker is seen at the foot of the bed and appears to be looking through a medical bag that has been laid on the bed. The trainee officer is off to the right of the room not far from the vanity.

When Sgt. Marek entered the room the chief of police can be heard saying, "there is paraphernalia and shit" and is seen pointing to the front of the room. From the video camera one can see that Sgt. Marek began looking off to his left in the front of the hotel room, where the police chief had pointed. The room appears messy with food containers on some of the tables. As he moves to the left of the room it appears that Sgt. Marek looks

at the table and bed area.  It is here that Sgt. Marek testified he observed a bag of white powder, a cellphone and a scale on the floor.  As Sgt. Marek is looking around in this area the police chief moved forward toward the door and is seen pointing to the bedstand and says to Sgt. Marek, "there is a bag and some white shit over there."

From the video one can see Sgt. Marek pick up a cell phone from a chair sitting next to the bed.  As Sgt. Marek continued to look through the room, the trainee officer, who is positioned at the foot of the bed, used a flashlight to bring attention to a plastic baggie containing a white substance on the nightstand.  Sgt. Marek took notice of this baggie and as he walked to the other side of the bed the police chief picked up the plastic baggie and said, "this was on the floor, it actually looks like salt" and then followed it up with "I think that's salt."  The baggie is then handed to Sgt. Marek and the police chief moves on to a book bag on the bed and states "there's a phone in this bag."  As Sgt. Marek looked at the plastic baggie he stated "that's not salt."  As the police chief seemed to look through the book bag the trainee can be heard pointing the sergeant to other items on the other side of the bed including another baggie with a white substance.  One can see Sgt. Marek move to the other side of the bed and continue searching the room based upon the trainee's observation.  At some point Sgt. Marek finds a paper that he indicated in his testimony was the bill from the hotel.

At this point there is a short conversation between Sgt. Marek and the trainee. In this colloquy the trainee made a comment about how the suspected drugs were ingested and that is responded to by Sgt. Marek, agreeing that no paraphernalia for ingesting was present, but that the items are "ours now." Following this exchange Sgt. Marek made contact via his radio to dispatch to run information containing information about the Defendant which was ostensibly found on a piece of paper obtained from the floor.

In his testimony Sgt. Marek stated that once he observed the baggies with a white substance, the scale, and the two cell phones he had begun a criminal investigation. During the whole time Sgt. Marek looked through the room the paramedics worked with the Defendant in the bathroom trying to address his medical situation. At no time did Sgt. Marek enter the bathroom. When the paramedics are trying to address the removal of the Defendant from the bathroom to a gurney, Sgt. Marek can be seen continuing to search the room and looking through drawers and bags ostensibly belonging to the Defendant.

\* \* \*

Det. Craig Revill of the Rossford Police Department testified concerning the policy of the Knights Inn relative to checking out. He had received this information from the head manager of Knights Inn. According

to the standard policy check-out at the hotel is 11:00 a.m. A person may stay in the room until 11:30 a.m. without any request to management from the guest. Typically, at 11:30 a.m. housekeeping staff is sent out to begin cleaning if someone is to be checking out. A guest may pay an extra $25 to stay until 2:00 p.m. According to Det. Revill if a person is not checked out by 2:00 p.m., has not departed the room, and housekeeping cannot effect a removal of the guest then the manager may be called over to evict the occupant. If this does not accomplish the intended result then the police may be called to the scene to assist with eviction.

## Assignments of Error

{¶ 6} Appellant asserts the following assignment of error on appeal:

1. The trial court committed reversible error when it granted Marshall's motion to suppress.

## Analysis

{¶ 7} Appellate review of a ruling on a motion to suppress presents a mixed question of fact and law. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. An appellate court must accept the trial court's findings of fact where those findings are supported by competent and credible evidence. *State v. Fanning*, 1 Ohio St.3d 19, 20, 437 N.E.2d 583 (1982). After accepting the trial court's factual findings as true, the reviewing court must independently determine, as a matter of law, whether the applicable legal standard has been met. *Burnside* at ¶ 8.

8.

{¶ 8} The state initially argues that the trial court created reversible error when it found that appellee had a reasonable expectation of privacy in Room 305 of the Rossford Knights Inn, where law enforcement arrived at the room after checkout time, and where appellee had not taken any actions to extend his stay.

{¶ 9} "'[T]he Fourth Amendment protection against unreasonable searches and seizures is not limited to one's home, but also extends to such places as hotel or motel rooms.'" *State v. Oliver*, 2018-Ohio-3667, 112 N.E.3d 573, ¶ 31 (8th Dist.), quoting *United States v. Bautista*, 362 F.3d 584, 589 (9th Cir.2004). (Additional quotations omitted.) Thus, "[a] registered hotel guest has a reasonable expectation of privacy in his room under the Fourth Amendment." *Oliver* at ¶ 31. That reasonable expectation of privacy is lost, however, "once the hotel guest voluntarily abandons the room, his status is lawfully terminated, or the rental period has expired." *Id.* at ¶ 32, citing *Bautista* at 589. (Additional quotations omitted.)

{¶ 10} Hotel staff may terminate a person's status as a guest by taking affirmative steps to repossess the room. *See id.* Alternatively, a guest may lose his status by surrendering or no longer renting the room. *See State v. Wright*, 8th Dist. Cuyahoga No. 99531, 2013-Ohio-4473, ¶ 9. It has been held that "[a] hotel guest automatically relinquishes his room at check-out time, when he has not paid for another night and the key has been returned to the hotel management." *State v. Miller,* 77 Ohio App.3d 305, 312-12, 602 N.E.2d 296, 301 (8th Dist.1991), citing *United States v. Savage* (5th Cir.1977), 564 F.2d 728, 733.

9.

{¶ 11} Once the guest's status has been lawfully terminated, "a hotel employee can consent to law enforcement's entry into a hotel room because the guest no longer has a reasonable expectation of privacy." *Id.* However, officers cannot reasonably rely on a hotel employee's consent in entering the room without actual or implied knowledge that the occupant's status as a guest has been terminated. *See*, *e.g., Oliver* at ¶ 32 (law enforcement must have actual or implied knowledge that the guest has been evicted from the hotel room before entering without a warrant).

{¶ 12} In the instant case, the state argues that appellee lost any reasonable expectation of privacy that he had in his room at 11:00 a.m., which was the hotel's standard check-out time, or, at the latest, at 11:30, after the customary grace period had expired. The time of the emergency call was 1:42 p.m., 18 minutes before the last moment a person may stay over in a room without indicating an intention to remain for an additional night. The management had taken no affirmative action to evict appellee from the room. Instead, the only action was an attempt by the maid to clean the room, when she found appellee passed out in the bathtub. Likewise, there is no evidence to suggest that appellee had abandoned or otherwise surrendered the room. Although the state accurately points to an absence of evidence suggesting that appellant intended to extend his stay until 2:00 p.m., we find this detail insignificant in this case, where there is no evidence to suggest when appellee became unconscious, at which time, of course, he would have become unable to express any intention whatsoever. We additionally note that neither appellee nor any hotel employee gave consent for the search, and, further,

10.

law enforcement had no idea whether appellee's status as a guest had terminated. Under the circumstances of this case, we find that appellee had a reasonable expectation of privacy in his hotel room.

{¶ 13} A search conducted without a warrant is per se unreasonable subject only to a few well-delineated exceptions. *State v. Stanberry,* 11th Dist. Lake No. 2002-L-028, 2003-Ohio-5700, ¶ 14, quoting *Katz v. Unites States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The doctrine of exigency is one such exception, and it applies where the police are faced with a "need to protect or preserve life or avoid serious injury." *Stanberry* at ¶ 14-15. Thus, "the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe a person within is in need of immediate aid." *Id.*, quoting *Mincey v. Arizona*, 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). "The emergency justifies the warrantless entry, and, while lawfully present, the police may seize evidence in plain view." *State v. Levengood*, 2016-Ohio-1340, 61 N.E.3d 766, ¶ 20 (5th Dist.), citing *Thompson v. Louisiana*, 469 U.S. 17, 105 S.Ct. 409, 83 L.Ed.2d 246 (1984). (Additional citation omitted.).

{¶ 14} A warrantless search, however, "must be 'strictly circumscribed by the exigencies which justify its initiation.'" *State v. Applegate*, 68 Ohio St.3d 348, 350, 626 N.E.2d 942 (1994), quoting *Terry v. Ohio*, 392 U.S. 1, 26, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Once an officer is inside a home, the question becomes "whether the

11.

'movements of the officers were conservative, prudent and reasonable.'" *State v. Levengood*, 2016-Ohio-1340, 61 N.E.3d 766, ¶ 22 (5th Dist.).

{¶ 15} The evidence is undisputed that Sgt. Marek was called to room 305 of the Knights Inn on December 18, 2019, for the sole purpose of rendering emergency medical aid to appellee. Within seconds of arriving at the property, Sgt. Marek informed the paramedics that they would need Narcan, indicating his understanding that the medical emergency was an overdose. Because Sgt. Marek arrived at the same time as Rossford paramedics -- who were the individuals primarily responsible for rendering medical aid -- the need for Sgt. Marek to render medical aid was immediately obviated. Under the circumstances, the conservative, prudent, and reasonable action would have been for Sgt. Marek to remain outside the room, while the paramedics went inside and performed their work. *See Levengood* at ¶ 22.

{¶ 16} As noted by the trial court, however, it appears from the video that Sgt. Marek was conducting a criminal investigation from the moment he entered the room. Seconds after his arrival in the room, the police chief can be heard saying "there is some paraphernalia and shit," while pointing to the nightstand closest to the entry door of the room. Sgt. Marek can be seen putting on gloves and his first move is to the nightstand where the police chief has pointed. Sgt. Marek claimed to be looking for identification when he first entered the room, but after picking up a brown paper bag on the floor, the next item he picks up -- from a chair -- is a blister package commonly used for drugs.

12.

{¶ 17} The state argues that the items that were retrieved in this case, including two cell phones, a scale, and bags of white powder, were in plain view and, thus, were properly seized. To qualify under the plain view exception, "it must be shown that (1) the initial intrusion which afforded the authorities plain view was lawful; (2) the discovery of the evidence was inadvertent; and (3) the incriminating nature of the evidence was immediately apparent. *State v. Williams*, 55 Ohio St.2d 82, 85, 377 N.E.2d 1013 (1978).

{¶ 18} Here, we find that Sgt. Marek cannot meet the first prong of the test, that he was lawfully present in the room, where paramedics were already on site rendering aid and where the police chief and trainee had already secured the safety of the room.

{¶ 19} Even if the state were to argue that the police chief and trainee could have obtained the seized items under the plain view doctrine, this argument would fail for several reasons. First, by the time the paramedics and Sgt. Marek arrived on the scene, the police chief and the trainee had already done all that was necessary to ensure the safety of the occupant, render any medical assistance, and ensure the safety of those rendering aid. Once the paramedics arrived, the justification for their presence in the room no longer existed. Second, the record contains no evidence as to how the police chief or the trainee discovered the items that were claimed to be in plain view. At one point in the video, the police chief states that one of the cell phones came from a bag on the bed. If this is correct, then at least one of the cell phones was not in plain view. In addition, the video demonstrates that neither the police chief nor the trainee knew that the

13.

bag containing the white substance was clearly illegal. On the video, the police chief, referring to the contents of the bag says, "I think that's salt." As there was no testimony (or bodycam evidence) from either the police chief or the trainee regarding where they found the items in question, whether they knew what the items were, whether they had any training or experience to identify illegal drugs or items associated with illegal drugs and trafficking, or whether any illegality associated with the items was immediately apparent, we cannot find that the items were properly seized under the plain view doctrine.

{¶ 20} The state argues that even if the search of appellee's hotel room was unconstitutional, any evidence that was obtained would inevitably have been discovered by the police through the housekeeper. The inevitable discovery rule provides that "'illegally obtained evidence is properly admitted in a trial court proceeding once it is established that the evidence would have been ultimately or inevitably discovered during the course of a lawful investigation.'" *State v. Clark*, 2018-Ohio-2029, 101 N.E.3d 758, ¶ 80 (6th Dist.), quoting *State v. Lewis*, 6th Dist. Lucas No. L-09-1224, 2010-Ohio-4202, ¶ 48. "'[T]he state must show that there is a high degree of probability that police would have discovered the derivative evidence apart from the unlawful conduct.'" *Lewis* at ¶ 48, citing *State v. Perkins*, 18 Ohio St.3d 193, 196, 480 N.E.2d 763 (1985).

{¶ 21} In the instant case, the state has not established that there was a high degree of probability that the housekeeper would have turned in all of the evidence. Although money that was subsequently discovered in appellee's room was, in fact, turned over to

14.

the police, neither the housekeeper nor the manager testified or otherwise provided any explanation as to what led them to do so. In addition, there was no testimony to suggest that if the housekeeper had found the baggies of white powder she would have done more than throw those items away or hold them for appellee, thinking, like the police chief, that they were baggies of salt. Thus, the state provided no evidence that the items illegally seized would have been obtained through other, lawful, means.

{¶ 22} Finally, the state argues that even if the search of appellee's room was constitutionally insufficient, the suppression of the evidence should not have occurred, because "faulting the contemporaneous, plain view observations of police officers during an ongoing emergency does nothing to further the interests of justice." We disagree. The purpose of the exclusionary rule is to deter police misconduct. *State v. Hoffman*, 141 Ohio St.3d 428, 2014-Ohio-4795, 25 N.E.3d 993, ¶ 3, citing *United States v. Leon*, 468 U.S. 897, 916, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Evidence is properly suppressed where a law enforcement officer can be said to have had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment. *State v. Dibble,* 159 Ohio St.3d 322, 2020-Ohio-546, 150 N.E.3d 912; *see also Leon* at 919. In the instant case, the actions of the officers demonstrate a complete rejection of the intent and purposes of the Fourth Amendment. Instead of the actions that were taken, the officers who were legally in the room could simply have obtained a search warrant based upon their observations. There was no danger of destruction of the

15.

evidence and the room could easily have been secured.  Given the actions of the officers in the current case, appellee's motion to suppress was properly granted.

{¶ 23} For all of the foregoing reasons, the judgment of the Wood County Common Pleas Court is affirmed.  Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Mark L. Pietrykowski, J.                           _____

                                                  JUDGE

Myron C. Duhart, P.J.         
CONCUR                                 _____

                                                    JUDGE

Christine E. Mayle, J.,
DISSENTS.


**MAYLE, J., dissenting:**

{¶ 24} I respectfully dissent from the majority decision because I would find that at 1:42 p.m., when Knights Inn staff called 9-1-1, Marshall's term of occupancy had expired, and he no longer had a reasonable expectation of privacy in the hotel room.

{¶ 25} The majority recognizes that a hotel guest loses his or her reasonable expectation of privacy in a hotel room "once the hotel guest voluntarily abandons the room, his status is lawfully terminated, or the rental period has expired," at which point a

hotel employee may consent to law enforcement's search of the hotel room. Nevertheless, it concludes that Marshall maintained a privacy interest in the room after checkout time and the search was unlawful because (1) no affirmative action had been taken to evict Marshall from the room; (2) Marshall's lack of consciousness prevented him from expressing whether or not he intended to extend his stay until 2:00 p.m., (3) neither Marshall nor any hotel employee gave consent for the search; and (4) law enforcement "had no idea whether [Marshall's] status as a guest had terminated." I address these conclusions out of order.

{¶ 26} First, I disagree that law enforcement had no idea whether Marshall's status as a guest had terminated. To the contrary, the trial court found that the housekeeper told the 9-1-1 dispatcher that she had entered Room 305 to clean it because the occupant was supposed to have checked out. The call occurred at 1:42 p.m., well beyond the 30-minute grace period that the hotel allows before sending its housekeeping staff to prepare the rooms for new guests. There was no evidence presented to indicate that the housekeeper incorrectly believed that Marshall was supposed to have checked out.

{¶ 27} Second, it is immaterial that Marshall's lack of consciousness prevented him from expressing whether or not he intended to extend his room rental to 2:00 p.m.— it matters only that no such intention was expressed. In the absence of an expressed intention to extend the stay (which required payment of $25), the rental period expired at 11:00, or 11:30 a.m., at the latest, when the "grace period" expired. Other Ohio cases support this position.

17.

**{¶ 28}** In *State v. Bollheimer*, 12th Dist. Warren No. CA2019-02-014, 2020-Ohio-60, for instance, the motel checkout time was 11:00. Around that time, a housekeeper knocked on the door of Room 259, and when no one answered, used her key to enter. The defendant and another person were still in the room. The housekeeper told them that it was time to check out, and they indicated that they were unsure if they were staying another night. The housekeeper went to the front office, but was instructed to return to the room, implying to her that the defendant had not paid for an additional night. At 11:15 a.m., police came to the hotel with arrest warrants and photos of the men. The housekeeper confirmed that they were the occupants of Room 259. She led police to the room, knocked as she did before, and when they did not answer, she again used her key to unlock the door. Police entered the room, arrested the men, and searched the room.

**{¶ 29}** On appeal, the defendant acknowledged that once a guest abandons a motel room, the motel staff can consent to a search of the room. He argued, however, that the search of his room was impermissible because the housekeeper was unsure whether he had paid for an additional night and he had not yet returned his room key.

**{¶ 30}** The Twelfth District found that there was competent, credible evidence that the room had been relinquished at the time of the search. "Specifically," the court explained, "the housekeeper testified that if guests plan to stay for an additional night, they are required to pay for that night before their rental period expires," otherwise "they are expected to leave at checkout time." *Id.* at ¶ 15. Because the defendant did not pay for an additional night before he was required to check out of the room and did not state

18.

whether he intended to stay another night or leave the motel, the court found that the defendant "automatically relinquished all rights of privacy to the room when his rental period expired." *Id.*

{¶ 31} Moreover—recognizing that the common practice is to vacate a hotel room and simply leave the key card in the room—the Twelfth District rejected defendant's claim that a guest must return his key before he can be found to have automatically relinquished his right to the room. It found that "the return of the key is of less significance than the fact that the checkout time ha[s] passed." *Id.* at ¶ 16. *See also State v. Montgomery,* 2d Dist. Clark No. 98 CA 92, 2000 WL 331798, * 4 (Mar. 31, 2000) (concluding that turning in motel room key is not a prerequisite to giving up the right to privacy in the room).

{¶ 32} Accordingly, because checkout time was almost four hours before hotel staff allowed law enforcement into Marshall's room, and Marshall expressed no intention to extend the length of stay—regardless of the reason—I would find that he relinquished any right to privacy in the room.

{¶ 33} Third, I disagree that the hotel staff was required to take affirmative action to evict Marshall from the room. The case upon which the majority relies for this proposition, *State v. Oliver*, 2018-Ohio-367, 112 N.E.3d 573, ¶ 33 (8th Dist.), actually states that "a hotel guest *who has not voluntarily abandoned his room or exceeded his rental period* maintains a reasonable expectation of privacy unless the hotel staff takes affirmative steps to lawfully terminate his status as a guest or evicts him from his room."

(Emphasis added.)  In other words, affirmative action to evict is required only if the guest has not voluntarily abandoned the room or if the length of stay has not expired.[1]

{¶ 34} Here, because checkout time had passed without Marshall requesting to extend his stay, his expectation of privacy automatically expired when the rental period expired.  *See United States v. Huffhines,* 967 F.2d 314 (9th Cir.1992) ("A guest in a motel has no reasonable expectation of privacy in a room after the rental period has expired.); *Bollheimer,* 12th Dist. Warren No. CA2019-02-014, 2020-Ohio-60, ¶ 17 (finding that defendant automatically relinquished his room at checkout time); *Montgomery* at * 5 ("[O]fficers' search of the motel room after check out time was proper.").  No affirmative action was required to evict him.

{¶ 35} Finally, while it is true that Marshall did not consent to a search of the hotel room, I do not agree that the hotel staff did not consent to the search.  The hotel staff

---

[1] Neither *Oliver* nor the cases it cites involved a search that occurred after checkout time. In *Oliver,* the defendant argued that trial counsel was ineffective for failing to file a motion to suppress evidence obtained when police searched his hotel room.  The defendant's rental period had not yet expired, *see* ¶ 3 (explaining that police had been called to the hotel in the early morning hours and were called again two and one-half hours later), and the hotel had taken no steps to evict him.  The court found that the record was too undeveloped to determine whether a motion to suppress would have been successful.  In *State v. Wright*, 8th Dist. Cuyahoga No. 99531, 2013-Ohio-4473, ¶ 4, cited by *Oliver,* the search took place before checkout, defendant did not voluntarily abandon the room, and the hotel took no affirmative steps to evict him.  And in *State v. Nickelson*, 7th Dist. Belmont No. 16 BE 0039, 2017-Ohio-7503, ¶ 22, also cited by *Oliver,* the court found that hotel staff took affirmative steps to evict the defendant where they called police "demanding assistance in evicting a guest; explaining and showing the evidence of drug trafficking to police * * *; and providing police with the room key with instructions to remove the guest from the premises."

20.

called 9-1-1 and allowed officers into the room. In any event, Marshall lacks standing to challenge the search on the basis that the hotel staff did not consent to it. "[I]in order to have standing to challenge the legality of a search, a person must have an expectation of privacy that society is prepared to recognize as 'reasonable.'" *State v. Fleming,* 2d Dist. Clark No. 2003CA71, 2001 WL 34664610, * 3 (Sept. 30, 2001), citing *Minnesota v. Olson*, 495 U.S. 91, 95-96, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1995). Because I would find that Marshall had no reasonable expectation of privacy in the hotel room after the checkout time, I would also find that he lacks standing to challenge the search on the basis that hotel staff did not consent to it.

{¶ 36} For these reasons, I would reverse the judgment of the Wood County Court of Common Pleas granting Marshall's motion to suppress evidence and I would remand this matter to the trial court for further proceedings.

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.

21.