[Cite as *State v. Whites Landing Fisheries, L.L.C.*, 2017-Ohio-4021.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

State of Ohio

      Appellant

v.

Whites Landing Fisheries, LLC

      Appellee

Court of Appeals No. E-16-065

Trial Court No. CRB 1500352ABC

**DECISION AND JUDGMENT**

Decided: May 26, 2017

* * * * *

Mike DeWine, Ohio Attorney General, Robert W. Cheugh, II, and
Kenneth H. Egbert., Jr., Assistant Attorneys General, for appellant.

William H. Smith, Jr. and Samuel A.J. Sidoti, for appellee.

* * * * *

**MAYLE, J.**

{¶ 1} Plaintiff-appellant, the state of Ohio, appeals the September 26, 2016

judgment of the Huron Municipal Court, granting the motion to dismiss of defendant-

appellee, Whites Landing Fisheries, Inc. For the reasons that follow, we reverse the trial court judgment.

## I. Background

{¶ 2} Whites Landing Fisheries ("WLF") is a company engaged in the commercial fishing industry and licensed by the Ohio Department of Natural Resources ("ODNR"). On November 10, 2015, WLF was charged with three separate counts of harvesting Lake Erie yellow perch in excess of the established quota, a violation of R.C. 1533.341 and Ohio Adm. Code 1501:31-3-12. Because WLF had two prior convictions, it faced permanent revocation of its commercial fishing license if convicted of any of the three charges.

{¶ 3} Quotas for the harvesting of Lake Erie yellow perch are determined annually by pound and are allocated by statistical districts called "management units." R.C. 1533.341; Ohio Adm.Code 1501:31-3-12(A). Lake Erie yellow perch "management units" are defined by Ohio Adm. Code 1501:31-1-02(MMM) as "the geographic area within the lake Erie fishing district by which yellow perch quotas are allocated. * * *." The Ohio regulations define three Lake Erie yellow perch management units.

{¶ 4} In a letter dated April 14, 2015, ODNR notified WLF that "there will be no [commercial] allocation [of yellow perch] in Management Unit 1 (MU1), 1.311 million lbs in Management Unit 2 (MU2), and 266,030 lbs in Management Unit 3 (MU3)." In other words, the 2015 yellow perch quota for management unit one was zero. The state claims that WLF harvested yellow perch from management unit one. Two of the counts

2.

against WLF alleged that it harvested 100 pounds of yellow perch, and one alleged that it harvested 200 pounds.

{¶ 5} At issue here are the definitions of "management unit one" and "management unit two." Those units are defined by Ohio Adm. Code 1501:31-1-02(MMM) as follows:

(1) Unit 1

(a) Lake Erie yellow perch management unit one shall consist of all waters in Lucas, Ottawa and Erie counties between east and west boundaries as defined:

(i) The west boundary is the Michigan-Ohio state line beginning in Maumee bay and extending northeast to the United States-Canada international line in Lake Erie including all waters in Lucas and Ottawa counties.

(ii) The east boundary begins at the Huron pier lighthouse, *extends along an imaginary line running northeast to the eighty-two degree, thirty minute meridian* and thenceforth along the meridian north to the United States-Canada international line.

(2) Unit 2

(a) Lake Erie yellow perch management unit two shall consist of all waters in Lorain and Cuyahoga counties between west and east boundaries as defined:

3.

(i)  The west boundary shall begin in the Huron river, including all boat ramps or marinas connected to the Huron river, *then extending from the Huron pier lighthouse along an imaginary line northeast to the eighty-two degree, thirty minute meridian* and thenceforth along that meridian north to the United States-Canada international line.

(ii)  The east boundary begins at the Fairport harbor light, extends north along the eighty-one degree, twenty minute meridian to the United States-Canada international line.  (Emphasis added.)

{¶ 6} WLF argues—and the trial court agreed—that Ohio Adm. Code 1501:31-1-02(MMM)(1)(a)(ii) and (MMM)(2)(a)(i), defining the east boundary of management unit one and the west boundary of management unit two, are ambiguous in their use of the word "northeast."  WLF's argument and the trial court's conclusion are premised on the fact that https://www.merriam-webster.com/ provides more than one definition for "northeast": (a) "the general direction between north and east," and (b) "the point midway between the north and east compass points."  The state insisted that "northeast" refers to a compass point of 45 degrees, but the court concluded that "northeast" could refer to any point beyond zero degrees but before 90 degrees.  It held, therefore, that "management unit one," is unconstitutionally vague, thereby rendering R.C. 1533.341 and Ohio Adm. Code 1501:31-3-12 "void as they are applied to the violations against" WLF.

4.

**{¶ 7}** It is from this judgment that the state appealed. It assigns the following errors for our review:

ASSIGNMENT OF ERROR 1

OHIO ADM.CODE 1501:31-1-02(MMM) IS NOT VAGUE MERELY BECAUSE THE RULE DOES NOT DEFINE THE WORD "NORTHEAST" AS PART OF THE EAST BOUNDARY OF LAKE ERIE YELLOW PERCH MANAGEMENT UNIT 1 AND TWO DICTIONARY DEFINITIONS OF THE WORD EXIST.

ASSIGNMENT OF ERROR 2

THE WORD "NORTHEAST" IS NOT UNCONSTITUTIONALLY VAGUE AS USED IN OHIO ADM.CODE 1501:31-1-02(MMM) BECAUSE IT SHOULD BE READ IN THE CONTEXT OF A DEFINED COMPASS DIRECTION IN COMMERCIAL FISHING AND CONSTRUED ACCORDING TO THE RULES OF GRAMMER [sic] AND COMMON USAGE AS THE MIDWAY POINT OF 45 DEGREES BETWEEN THE NORTH AND EAST COMPASS POINTS.

## II. Law and Analysis

**{¶ 8}** In its first assignment of error, the state argues that the trial court failed to apply the common, everyday meaning of the word "northeast." It argues that "northeast" is a specific direction or point on a compass of 45 degrees, precisely between the directions of north and east. It points to the testimony of Dr. Christopher Vandergoot, a

5.

biologist with ODNR's Sandusky Fishery Research Office, who characterized this as standard knowledge. It maintains that a word is not per se unclear or unconstitutionally vague merely because the dictionary provides two definitions for it or because it is not defined in a statute, and it urges that the meaning here must be ascertained in the context in which it appears—i.e., commercial fishing regulations.

{¶ 9} Similar to its first assignment, the state argues in its second assignment of error that "northeast," as commonly used and understood in nautical navigation, is a specific ordinal direction on a compass found at a point equally between the cardinal directions of north and east. While the trial court suggested that the management units should have been more specifically defined in a way similar to a metes and bounds description for real estate, the state urges that this is impractical and that an ordinary person would understand that in the context of commercial fishing regulations, "northeast" means a 45-degree angle on a compass. It emphasizes that the regulation did not define the boundaries for the management unit by describing it as "in a northeasterly direction," thus to interpret it as anything other than at 45 degrees would change the clear, unambiguous meaning of the words used.

{¶ 10} The state also insists that WLF was on notice of the zero quota for management unit one because it was specifically advised of it in a letter sent by ODNR and received by WLF via certified mail. And it points out that the violations did not occur at or near the angular boundary line—they occurred further north. Thus, it

6.

maintains, under the facts of this case, it was clear that the fish were harvested from management unit one.

{¶ 11} As to both of the state's assignments of error, WLF responds simply that "there is no defined compass direction as 'Northeast,' particularly along an imaginary line." It maintains that "northeast" may be anywhere between zero and 90 degrees. And it insists that Dr. Vandergoot himself admitted that no bearing is defined and that "someone else would find it a vague [sic] because it doesn't give a specific bearing."

### A. The void-for-vagueness doctrine.

{¶ 12} "Under the Due Process Clauses of the Fourteenth and Fifth Amendments to the United States Constitution and Article I, Section 16 of the Ohio Constitution, any statute which fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute is void for vagueness." (Internal citations omitted.) *State v. Tanner*, 15 Ohio St.3d 1, 3, 472 N.E.2d 689 (1984), quoting *Papachristou* v. *City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 838, 31 L.E.2d 110 (1972). Indeed, a statute or regulation must meet three requirements to survive a challenge under the void-for-vagueness doctrine. *Viviano v. Sandusky*, 2013-Ohio-2813, 991 N.E.2d 1263, ¶ 15 (6th Dist.), citing *Grayned v. City of Rockford,* 408 U.S. 104, 108-109, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). "It must (1) provide fair warning to the ordinary citizen of what conduct is proscribed, (2) preclude arbitrary, capricious, and discriminatory enforcement, and (3) not impinge upon constitutionally protected rights."

7.

*Id.* The crime and its elements must be expressed clearly enough for an ordinary person to choose, in advance, what course he may lawfully pursue. (Citations omitted.) *Tanner* at 6.

{¶ 13} Despite these well-recognized principles, a statute need not avoid all vagueness and is not necessarily void for vagueness merely because it could have been worded more precisely. *State v. Stallings*, 150 Ohio App.3d 5, 2002-Ohio-5942, 778 N.E.2d 1110, ¶ 12 (9th Dist.); *State v. Dorso*, 4 Ohio St.3d 60, 61-62, 446 N.E.2d 449 (1983). In fact, both the Ohio and U.S. Supreme Courts have recognized that "[m]any statutes will have some inherent vagueness, for in most English words and phrases there lurk uncertainties." (Internal quotations and citations omitted.) *Dorso* at 62, quoting *Rose v. Locke,* 423 U.S. 48, 49-50, 96 S.Ct. 243, 46 L.Ed.2d 185 (1975). Accordingly, "[a] statute will not be found void for vagueness if any 'reasonable and practical construction' can be given to its language." (Citations omitted.) *State v. Sommerfield*, 3d Dist. Union No. 14-05-23, 2006-Ohio-1420, ¶ 16.

{¶ 14} Nor is a statute necessarily void for vagueness because it fails to define a term or phrase. To the contrary, "[a] legislative body need not define every word it uses in an enactment." *Dorso* at 62. Undefined terms must simply be accorded their common, everyday meaning. *Id.* This principle is codified in R.C. 1.42, which provides that "[w]ords and phrases shall be read in context and construed according to the rules of grammar and common usage. Words and phrases that have acquired a technical or

8.

particular meaning, whether by legislative definition or otherwise, shall be construed accordingly."

### B.  Standard of review.

{¶ 15} The constitutionality of a statute or regulation is a question of law to be reviewed de novo.  *Thorp v. Strigari*, 155 Ohio App.3d 245, 2003-Ohio-5954, 800 N.E.2d 392, ¶ 10 (1st Dist.).  "All legislative enactments enjoy a presumption of constitutionality."  *Dorso* at 61.  In determining whether a statute or regulation is constitutional, therefore, we must apply all presumptions and pertinent rules of construction and indulge every reasonable interpretation in favor of its constitutionality.  *Id.* at 60.

{¶ 16} One who challenges the constitutionality of a statute on its face must show beyond a reasonable doubt that the statute is unconstitutional; one who challenges the constitutionality of a statute as applied must do so by clear and convincing evidence.  *State ex rel. Ohio Cong. of Parents & Teachers v. State Bd. of Educ.*, 111 Ohio St.3d 568, 2006-Ohio-5512, 857 N.E.2d 1148, ¶ 34.  The Ohio Supreme Court explained in *Harrold v. Collier*, 107 Ohio St.3d 44, 2005-Ohio-5334, 836 N.E.2d 1165, ¶ 37-38:

> A party may challenge a statute as unconstitutional on its face or as applied to a particular set of facts. *Belden v. Union Cent. Life Ins. Co.* (1944), 143 Ohio St. 329, 28 Ohio Op. 295, 55 N.E.2d 629, paragraph four of the syllabus.  A facial challenge to a statute is the most difficult to bring successfully because the challenger must establish that there exists no

9.

set of circumstances under which the statute would be valid. *United States v. Salerno* (1987), 481 U.S. 739, 745, 107 S. Ct. 2095, 95 L. Ed. 2d 697. The fact that a statute might operate unconstitutionally under some plausible set of circumstances is insufficient to render it wholly invalid. *Id.*

Further, where statutes are challenged on the ground that they are unconstitutional as applied to a particular set of facts, the party making the challenge bears the burden of presenting clear and convincing evidence of a presently existing set of facts that make the statutes unconstitutional and void when applied to those facts. *Belden,* 143 Ohio St. 329, 28 Ohio Op. 295, 55 N.E.2d 629, at paragraph six of the syllabus.

These principles apply equally to administrative regulations. *Ohio Apt. Ass'n v. Levin*, 127 Ohio St.3d 76, 2010-Ohio-4414, 936 N.E.2d 919, ¶ 56.

### C. "Northeast" in the context of these regulations is not vague.

{¶ 17} In essence, the state claims in its first assignment of error that "northeast" is not vague merely because there exist multiple dictionary definitions for the term. And it claims in its second assignment of error that in ascertaining the meaning of the word, it is appropriate to consider the context in which the term is used. There is much overlap in the state's arguments in support of these assignments, therefore we address them together.

{¶ 18} The state argues that considering the dictionary definitions and the context in which the term is used—i.e., commercial fishing regulations—"northeast" is not

10.

vague.  It insists that for purposes of nautical navigation, "northeast" directs one to proceed at a 45-degree angle.  It maintains that the trial court and WLF's interpretation requires one to construe "northeast" to mean "in a northeasterly direction," and it claims that to do this would change the clear, unambiguous meaning of the word.

{¶ 19} Certainly, the fact that a word is undefined and the dictionary supplies more than one definition does not automatically render a regulation void.  It is also true that the context in which a word is used must be considered in determining its meaning.  In *Dorso,* 4 Ohio St.3d at 61-62, 446 N.E.2d 449, for instance, the Ohio Supreme Court declined to find an ordinance vague despite the fact that it contained a term that was undefined in the statute and had more than one dictionary definition.

{¶ 20} In *Dorso*, the defendant was convicted of violating an ordinance that prohibited playing music or amplifying sound "in such manner as to disturb the peace and quiet of the neighborhood, having due regard for the proximity of places of residence, hospitals, or other residential institutions and to any other conditions affected by such noises."  *Id.* at 60.  The defendant argued, among other things, that "neighborhood" was ambiguous and undefined.  The Ohio Supreme Court disagreed.  It examined the dictionary definitions; specifically, it recognized that Webster's Third New International Dictionary defined "neighborhood" to mean "the quality or state of being immediately adjacent or relatively near to something," and Webster's New Collegiate Dictionary defined it to denote "a place or region near" and "the people living near one another."  *Id.* at 62.  Considering these definitions and the context in which the word was used in the

11.

ordinance, the court found that the meaning of "neighborhood" was within the ken of an ordinary person and that no further specificity was required. *Id.*

{¶ 21} *Dorso* involved a generally-applicable municipal ordinance. Here, the provisions at issue are directed at commercial fishermen. *See* R.C. 1533.341 ("No person who holds a commercial fishing license * * * and who uses trap nets shall harvest a quantity of yellow perch that is in excess of the amount of yellow perch that is allocated for the person's commercial fishing license in accordance with the quota set pursuant to this section.") (Emphasis added.) R.C. 1.42 explains that where a word or phrase has acquired "a technical or particular meaning, whether by legislative definition or otherwise," that word or phrase shall be construed accordingly. Moreover, Ohio case law recognizes that "[w]here a statute regulates a specialized industry utilizing terms which have acquired a technical meaning in the industry, the words of the statute require a technical interpretation considered in the light of the statutory purpose." *State v. Rentex, Inc.*, 51 Ohio App.2d 57, 365 N.E.2d 1274 (8th Dist.1977), paragraph one of the syllabus.

{¶ 22} The state contends that "[t]he word 'northeast,' as commonly understood and used in nautical navigation, is a specific ordinal direction on a compass found at a point equally between the cardinal directions of north and east." It explains that "[t]his ordinal direction of 'northeast,' which is at 45 degrees * * * is also commonly known as an intercardinal direction."

{¶ 23} The court conducted a hearing on a number of pretrial motions on August 26, 2016, at which the state offered testimony from Dr. Vandergoot. At the hearing,

12.

WLF's counsel cross-examined Dr. Vandergoot about the boundaries separating management unit one from management unit two. WLF claims that Dr. Vandergoot established that "northeast" is vague. It quotes Dr. Vandergoot's testimony in its brief:

Q: Is there a bearing to get to the longitude line of 82:30.

A: No

Q: There's no bearing. So it's an imaginary or speculation as to how you get there from the Huron County lighthouse; is that correct.

A: One could infer that.

* * *

Q: One could infer that. So it doesn't specifically define the unit 1 and where it ends and where unit 2 begins; is that correct.

A: Not in that language.

Q: And that's the language of the Ohio Revised Code and the Ohio Administrative Code?

A: Correct.

{¶ 24} But Dr. Vandergoot immediately retreated from this position as the questioning continued. He testified:

Q: (Inaudible.) So based on the language and the chart you cannot affirmatively explain to this court the boundaries of unit MU-1 and MU-2. Is it MM-1 and MM-2.

13.

A: Well, actually it says it extends—well, actually, you would be able to infer that. I take that back.

Q: Can you go infer, can you specifically tell the court where MU-1 ends and MU-2 starts?

A: Oh, yes, actually you would be able to. So if it says here if you went to—I apologize after reading this.

Q: You read it, yes.

A: If you go from the Huron Pier lighthouse it extends along an imaginary line running northeast to the 82:30, 82 degrees, 30 minute meridian. So if you were standing on the lighthouse and you had a compass and it went 45 degrees, because that would be northeast, you be able [sic] to determine where a (inaudible).

Q: Where does it say the degree or the heading?

A: It says right here, along the imaginary line running northeast.

Q: Okay. Northeast, is that defined anyplace as being 45 degrees?

A: That's standard knowledge.

Q: Isn't a compass starting at 0 and going to 90 and anywhere in between those would be north, northeast or northwest. That would be the northeast?

A: No, because if you give directions saying I went northeast bearing, it's 45 degrees.

**{¶ 25}** The state, through Dr. Vandergoot, offered a reasonable interpretation of "northeast" as the term is used in the context of navigating waters. Other than to simply deny that the state offered a correct interpretation, WLF presented no evidence challenging the state's position. While it is true that Dr. Vandergoot initially agreed that Ohio Adm. Code 1501:31-1-02(MMM) does not provide a specific bearing to get to the eighty-two degree, thirty minute meridian, upon re-reading the definition for "management unit," he realized that it provided a bearing of 45 degrees insofar as it described the direction as "northeast."

**{¶ 26}** WLF had the burden to show beyond a reasonable doubt that the statute is unconstitutional. It failed to do so. Because WLF failed to meet its burden, we find the state's two assignments of error well-taken, and we reverse the judgment of the trial court.

### III. Conclusion

**{¶ 27}** We conclude that the state offered a reasonable interpretation of "northeast" as the term is used in the context of commercial fishing regulations, thus WLF failed to satisfy its burden of proving beyond a reasonable doubt that Ohio Adm. Code 1501:31-1-02(MMM) is unconstitutional. We find the state's two assignments of error well-taken and reverse the September 26, 2016 judgment of the Huron Municipal Court. We remand this case to the trial court for proceedings consistent with this decision. WLF is ordered to pay the costs of this appeal under App.R. 24.

Judgment reversed.

15.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.                          _____
                                                          JUDGE
Thomas J. Osowik, J.

                                             _____
Christine E. Mayle, J.                                    JUDGE
CONCUR.

                                             _____
                                                          JUDGE