[Cite as *King v. Buildtech Ltd. Constr. Dev.*, 2023-Ohio-1092.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Worn D. King

    Appellant

v.

Buildtech Ltd. Construction
Development, et al.

    Appellees

Court of Appeals No.  L-22-1088

Trial Court No.  CI0202001970

**<u>DECISION AND JUDGMENT</u>**

Decided:  March 31, 2023

* * * * *

Kevin J. Boissoneault and Jonathan M. Ashton, for appellant.

Peter C. Munger, for appellee, Buildtech Ltd. Construction Development

John M. Conway, for appellee, Construction Development Professionals, LLC

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, Worn King, appeals the March 16, 2022 decision of the Lucas

County Court of Common Pleas granting summary judgment in favor of appellees,

Buildtech Ltd. Construction Development ("Buildtech") and Construction Development

Professionals ("CDP"), on King's employer intentional tort and negligence claims. Because CDP is entitled to statutory immunity and King failed to show that Buildtech had the intent necessary to be liable for an employer intentional tort, we affirm.

## I. Background and Facts

{¶ 2} In May 2016, King was working as a general laborer on a construction project at the Berdan Building in Toledo when he fell through a hole in the floor and sustained serious injuries. At the time of his accident, King was employed by Manpower Incorporated of Toledo ("Manpower"), a temporary employment agency. Manpower and Buildtech, the general contractor for the construction project, had an oral agreement under which Manpower leased workers, including King, to Buildtech for the Berdan project. Buildtech, through an oral agreement, hired CDP as the project manager for the Berdan project.

## A. Buildtech and CDP's relationship

{¶ 3} The testimony regarding Buildtech and CDP's relationship at the time of King's accident was a bit muddled. Kevin Prater, "the part owner of CDP," is the only witness either party tendered on summary judgment who was part of either Buildtech's or CDP's ownership or executive team. In his affidavit, Prater said that "Buildtech had no employees so CDP was hired to provide folks to work on and oversee the [Berdan] project." In its responses to interrogatories, Buildtech also said that, at the time of the accident, "all personnel on site acting for Buildtech were leased workers from CDP and

2.

Manpower * * *[,]" and that CDP's relationship to Buildtech was "provid[ing] workers at Buildtech's request."

{¶ 4} The workers who were deposed were sometimes unclear on which entity employed them (for example, King, who was technically employed by Manpower, thought that he was employed by Buildtech), but the majority of the supervisory employees—including site superintendents and project managers—testified that CDP was their employer, and the two superintendents who were interviewed for the workers' compensation investigation told the investigator that they were employed by CDP.

{¶ 5} Adding to the confusion were the log-in sheets at the Berdan site, which had "Buildtech Ltd" at the top, and listed "BT"—i.e., Buildtech—in the "COMPANY" column on the log-in sheet for workers not hired through temporary employment agencies.

{¶ 6} On the whole, however, it appears that CDP was the company providing supervisory services at the site, and CDP employees were overseeing King's work on the day of his accident.

### B. King's accident

{¶ 7} The day of the accident was King's third day at the Berdan site. King and another temporary employee, Michael Steinberg, were using a cart to move lumber to the second level of the building. The wood on the cart was secured in a bundle by a strap, which King pulled while Steinberg pushed the cart. The area of the building where they

3.

were delivering the wood was flat and level, but the floorboards were warped. While the men were moving their first load of lumber, the cart got stuck in the floorboards, but they dislodged it without incident.

{¶ 8} The cart got stuck in the floorboards again while they were moving their second load. To unstick the cart, Steinberg pushed the cart and King pulled on the strap securing the bundle of wood. To accomplish this, King had his back toward a hole in the floor where floorboards were being replaced. The hole was between five and ten feet from King and the cart. While King was pulling on the strap, he felt "something give[]"; he was unsure if the strap slipped from his hands or off of the bundle of lumber. King stumbled backward when the strap slipped, and his momentum caused him to fall through the hole in the floor. He fell approximately 12 feet to the first level of the building, landing on his back.

{¶ 9} Immediately following his fall, King was able to sit, stand, and walk upstairs on his own. He refused when Tom Holdren, one of the project superintendents, offered to call an ambulance or get him to the hospital, and he told Holdren that "I'm cool. I think I'm all right." During the workers' compensation investigation regarding the accident, Holdren and Jake Lindke, an assistant project manager for CDP, each reported to the investigator that King said he was "no bitch," did some jumping jacks to prove that he was fine, and returned to the second level of the building to finish moving the wood. King and Steinberg completed incident reports before leaving the jobsite that day.

4.

{¶ 10} The next day, King came to work and completed his half-day shift as scheduled. Following his shift, he went to the hospital because his back was causing him severe pain. Doctors discovered that King had three fractured vertebrae in his lower back. Several days later, doctors also discovered extensive injuries to King's colon. King's injuries continue to cause him pain, and have affected the quality of his life.

{¶ 11} The parties dispute whether the hole that King fell through had guardrails. King told the workers' compensation investigator and testified at his deposition that the hole was unguarded. Steinberg also testified at his deposition that the hole was unguarded. Holdren and Lindke told the workers' compensation investigator and testified at their depositions that the hole was surrounded by guardrails, but had a gap or an opening that was approximately 18 inches wide that King could have fallen through. Additionally, Scott Szakovits, a representative from Manpower, testified that he visited the construction site before agreeing to lease workers to Buildtech, and, at that time, any openings in the floor had guardrails around them. When Szakovits returned to the site several days after King's fall, the guards were still in place. However, Szakovits also testified that workers at the site during his visit after King's fall told him that the guardrails were not there at the time of the accident.

{¶ 12} King received workers' compensation benefits because of the accident. He also filed an application for additional compensation based on a claimed violation of a specific safety requirement ("VSSR"), i.e., that Buildtech failed to comply with Ohio

5.

Adm.Code 4123:1-3-04(D)(1), which requires that temporary "[f]loor openings shall be guarded by a standard guard railing and toeboard or a cover * * * so constructed that the cover cannot be accidentally displaced[,]" or that the employer provide "[a] safety belt or harness with a lanyard * * * in lieu of a standard guard railing and toeboard or cover." King's VSSR application listed Manpower as his employer, and "Buildtech, Ltd" as the "name * * * of the employer where the work was being performed."

{¶ 13} King settled his VSSR claim. The settlement agreement listed King as the "'Injured Worker'" and "Buildtech/Constr. Dev. Professionals" as the "'Customer-Employer.'" The agreement included a release of any other claims (except claims to regular workers' compensation benefits) that King might have "against Customer-Employer because of Customer-Employer's claimed violation of a specific safety requirement." The release also said that "[i]t is the intention of the parties that this settlement cover only the application for additional benefits because of the claimed violation of a specific safety requirement * * *."

{¶ 14} Although CDP was named in the VSSR settlement agreement, the record of the VSSR proceedings shows that CDP was not named in the application and apparently did not participate in the case, and the attorney who represented King in the VSSR proceedings submitted an affidavit in which he averred that "CDP was never the 'customer-employer' and was not a party to the [VSSR] matter."

## C. Trial court proceedings

6.

{¶ 15} King sued Buildtech and CDP. As relevant here, King alleged a negligence claim against CDP, and negligence and intentional tort claims against Buildtech.

{¶ 16} Buildtech and CDP jointly moved for summary judgment on King's claims against them. They argued that they were entitled to immunity from the negligence claims under the workers' compensation statutes, the VSSR settlement agreement released any claims King had against the companies, and King failed to present evidence that Buildtech had the necessary intent to support his intentional tort claim.

{¶ 17} King responded that CDP was not the entity that leased workers from Manpower—and thus was not his employer for immunity purposes—so it was not entitled to workers' compensation immunity. He also argued that he had demonstrated the necessary intent by showing that Buildtech failed to install guardrails, which was the equivalent of deliberately removing an equipment safety guard and gave rise to a rebuttable presumption of Buildtech's intent to injure.

{¶ 18} The trial court granted summary judgment to Buildtech and CDP. The court found that R.C. 4123.74 immunized Buildtech from liability on King's negligence claim because Buildtech, as Manpower's customer who leased King's services, was considered King's employer for workers' compensation purposes.[1] The court went on to determine that the statute also gave CDP immunity from King's negligence claim because "CDP had the right to control the manner and means of Mr. King's work

---

[1] King is not appealing the trial court's decision on the negligence claim against Buildtech.

performance and, thus, was functionally Mr. King's employer." The evidence on summary judgment showed that the prerequisite to immunity in R.C. 4123.74—i.e., that R.C. 4123.35 had been complied with through the payments of workers' compensation premiums for King—so CDP was entitled to immunity, despite only paying the workers' compensation premiums indirectly through Buildtech's agreement with Manpower.

{¶ 19} Regarding King's intentional tort claim, the trial court determined that failing to install guardrails around a hole in the floor was not the equivalent of "[d]eliberate removal" of an "equipment safety guard" under R.C. 2745.01(C), so the fact that the hole King fell through was unguarded did not give rise to a rebuttable presumption that Buildtech had the intent to injure King. Further, although a hole in the floor presented a danger, "the mere existence of an unguarded hole is insufficient for the Court to conclude that Mr. King's injury was 'substantially certain to occur.'" Because Buildtech's actions (or inactions) did not rise to the level of "intent to injure another" or a "belief that the injury was substantially certain to occur[,]" the trial court found that King could not sustain his intentional tort claim.

{¶ 20} King now appeals, raising one assignment of error:

> I. The trial court erred when it granted summary judgment in favor of Appellees Buildtech Ltd. Construction Development and Construction Development Professionals LLC.

## II. Law and Analysis

{¶ 21} Under his assignment of error, King makes two separate arguments: (1) CDP does not qualify for immunity under R.C. 4123.74; and (2) Buildtech is liable for an intentional tort because King was entitled to a presumption of intent under R.C. 2745.01(C), and Buildtech's conduct met the requirements of R.C. 2745.01(A). We address each argument in turn.

### A. Standard of review

{¶ 22} An appellate court reviews summary judgment de novo, employing the same standard as the trial court. *Grafton v. Ohio Edison Co.,* 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996); *Lorain Natl. Bank v. Saratoga Apts.,* 61 Ohio App.3d 127, 129, 572 N.E.2d 198 (9th Dist.1989). The court can grant a motion for summary judgment only when the moving party demonstrates:

> (1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor.

*Harless v. Willis Day Warehousing Co.,* 54 Ohio St.2d 64, 66, 375 N.E.2d 46 (1978); Civ.R. 56(C).

{¶ 23} The party seeking summary judgment must specifically delineate the basis upon which the motion is brought and identify those portions of the record that demonstrate the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996); *Mitseff v. Wheeler*, 38 Ohio St.3d 112, 526 N.E.2d 798 (1988), syllabus. When a properly supported motion for summary judgment is made, an adverse party may not rest on mere allegations or denials in the pleadings, but must respond with specific facts showing that there is a genuine issue of material fact. Civ.R. 56(E); *Riley v. Montgomery*, 11 Ohio St.3d 75, 79, 463 N.E.2d 1246 (1984). A "material" fact is one that would affect the outcome of the suit under the applicable substantive law. *Russell v. Interim Personnel, Inc.*, 135 Ohio App.3d 301, 304, 733 N.E.2d 1186 (6th Dist.1999); *Needham v. Provident Bank*, 110 Ohio App.3d 817, 827, 675 N.E.2d 514 (8th Dist.1996), citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**B. CDP is entitled to workers' compensation immunity.**

{¶ 24} In his first argument, King contends that CDP does not qualify for immunity from a negligence claim under R.C. 4123.74 because CDP did not pay any of the workers' compensation premiums for King. He argues that payment of premiums—either directly or indirectly—is the only way that an employer can take advantage of statutory immunity, and that the trial court misinterpreted the case law by determining

10.

that a party other than a staffing agency and its customer could take advantage of the immunity provided by R.C. 4123.74.

{¶ 25} CDP responds that it and Buildtech were leasing King's services from Manpower when King was injured, so both companies—not just Buildtech—are protected from King's negligence claims "by virtue of Ohio's workers' compensation exclusive remedy and 'loaned servant' doctrines." CDP contends that "**someone**" paying the workers' compensation premiums for an injured worker is sufficient to provide immunity to all entities deemed to be the worker's employers. (Emphasis sic.)

{¶ 26} Ohio's workers' compensation statutes provide that employers who "comply" with the premium-payment provisions of R.C. 4123.35 "shall not be liable to respond in damages at common law or by statute for any injury * * * received * * * by any employee in the course of or arising out of his employment * * *." R.C. 4123.74. Employees can have more than one "employer" for workers' compensation purposes. *Cowan v. Interdyne Corp.*, 3d Dist. Allen No. 1-12-26, 2013-Ohio-642, ¶ 17. For nearly 60 years, the Ohio Supreme Court has recognized that multiple entities can be a temporary worker's employer. *See Daniels v. MacGregor Co.*, 2 Ohio St.2d 89, 206 N.E.2d 554 (1965), syllabus. When the employer-employee relationship is not straightforward—for example, when the worker is a temporary employee, who, by definition, is technically employed by one company, but does all of his work for another company—the key to determining whether an entity is an injured worker's employer

11.

"depends on who had the right to manage the manner or means of day-to-day control over the employee, not who was responsible for administrative human resources matters." *Cowan* at ¶ 17, citing *Cottrill v. Thermo Electron North America, LLC,* 4th Dist. Washington No. 09CA34, 2010-Ohio-2238, ¶ 24. In other words, "[e]ven when another company supplies the workers and pays for the required workers' compensation insurance, the employer who controls the manner and means of performing the work is considered an employer for purposes of workers' compensation." *Stone v. N. Star Steel Co.*, 152 Ohio App.3d 29, 2003-Ohio-1223, 786 N.E.2d 508, ¶ 23 (7th Dist.).

{¶ 27} Here, when the evidence is construed most strongly in King's favor, there is no genuine dispute that CDP was directing and controlling King's work when he was at the Berdan site, making CDP one of King's employers for workers' compensation purposes.

{¶ 28} CDP maintains that it and Buildtech were both Manpower's customers, but nothing in the record supports this. Despite the somewhat murky testimony about Buildtech and CDP's business relationship, and the evidence of the companies' overlapping ownership, the testimony indicated that the companies are separate entities. Buildtech and CDP orally agreed that CDP would provide workers for the Berdan project—including the supervisory employees who worked at the Berdan site. The evidence also showed that Buildtech—and only Buildtech—had an agreement with Manpower to lease workers. CDP was not a party to that agreement, and cannot now

12.

claim that Buildtech's status as Manpower's customer somehow confers customer status on CDP, too.

{¶ 29} This does not affect the outcome, however, because the law does not provide that immunity under R.C. 4123.74 is limited to the employment agency and the agency's customer. In other words, R.C. 4123.74 does *not* say that "employers who *pay premiums* as provided in R.C. 4123.35" are entitled to immunity from suit. Rather, R.C. 4123.74 states that "[e]mployers who *comply with* * * *" R.C. 4123.35 are immune from suit. (Emphasis added).

{¶ 30} In *Russell*, 135 Ohio App.3d 301, 733 N.E.2d 1186, we interpreted the Second District's conclusion in *Carr v. Cent. Printing Co.*, 2d Dist. Montgomery No. 16091, 1997 WL 324107 (June 13, 1997), that "without [workers' compensation premium] payments by the customer of the employment agency, either directly or indirectly, such customer cannot claim status as an employer nor the attending immunity provided by R.C. 4123.74." We found that it meant premiums must be paid for an injured worker—regardless of who pays them—for any of the employers to receive immunity. *Russell* at 306. We made clear that "for an employer of a temporary employee to obtain immunity from a negligence suit, *someone* must pay the workers' compensation premiums and some evidence of that must be before the court." (Emphasis added.) *Id.* And we concluded that "[a]bsent evidence to the contrary," proof that "someone" paid workers' compensation premiums for the worker "satisfies the

13.

compliance requirement of R.C. 4123.74 and R.C. 4123.35 and entitles [the employer] to immunity from negligence suits." *Id.* Notably, we did not specify that an employment agency and its customer were the only two entities to which the rule applied, and we have not had occasion to analyze *Russell* in the workers'-compensation-immunity context since.[2]

{¶ 31} Here, it is undisputed that King received workers' compensation benefits, from which we can infer that *someone*—regardless of which entity it was—paid workers' compensation premiums for King. And an employer who does not directly pay workers' compensation premiums is entitled to statutory immunity. *Russell* at 306.

{¶ 32} The fact that workers' compensation immunity cases usually involve only two employers does not preclude a finding that a third employer also had immunity. Here, the employment agency's customer assigned its supervisory responsibilities over a temporary worker to a third entity, which controlled the day-to-day work of the employee. Thus, this case involves three employers: the employment agency (Manpower), the employment agency's customer (Buildtech), and the third entity that controlled the day-to-day work (CDP). Although CDP was neither the employment agency nor the agency's customer, *it was still King's employer for workers'*

---

[2] We have only cited *Russell* once in the context of a workers' compensation immunity case. *See Nielsen v. Andersons, Inc.*, 6th Dist. Lucas No. L-06-1073, 2006-Ohio-5118, ¶ 15. Although *Nielsen* cited the language from *Russell* requiring "someone" to pay workers' compensation premiums, the case did not analyze the holding in *Russell*. *See id.*

14.

*compensation purposes*, and is therefore entitled to immunity under R.C. 4123.74, as long as someone paid workers' compensation premiums for King under R.C. 4123.35.

{¶ 33} That "someone" was Manpower, and, because both Buildtech—as the entity contracting with Manpower—*and* CDP—as the entity directing and controlling King's work—qualify as King's employers for workers' compensation purposes, the immunity generated by Manpower's payment extends to *both* Buildtech and CDP. To be sure, there was nothing additional for Buildtech or CDP to do to "comply with" R.C. 4123.35 because the required premiums had already been paid on King's behalf. Buildtech and CDP were King's employers and in compliance with R.C. 4123.35, and are therefore entitled to immunity under R.C. 4123.74.

{¶ 34} Our conclusion is supported by the public policy underlying the workers' compensation system, which supports, in appropriate circumstances, multiple employers being protected by workers' compensation immunity. Under the workers' compensation system, a worker gives up some of his rights to sue his employers in exchange for "a certain and speedy recovery * * *" of compensation for his injuries. *Van Fossen v. Babcock & Wilcox Co.*, 36 Ohio St.3d 100, 110, 522 N.E.2d 489 (1988). As the Seventh District explained in *Stone*, any duty of care that an employer might have toward an employee "evaporates" under the workers' compensation immunity statute. *Stone*, 152 Ohio App.3d 29, 2003-Ohio-1223, 786 N.E.2d 508, at ¶ 28. The court went on to say

15.

that, when there are "coemployers" that are protected under the workers' compensation statutes,

> [i]f one of [multiple employers] is not considered an employer under the workers' compensation laws, the employee will get double compensation. * * * The employee will get his or her "certain and speedy recovery" through the workers' compensation program from the employer and still be able to sue based on negligence against the other company that is not considered the employer.

*Stone* at ¶ 29, citing *Carr*, 2d Dist. Montgomery No. 18281, 2000 WL 1513914. This outcome prevents the victim of a tort from recovering twice for the same injury, which the state is within its rights to do. *Holeton v. Crouse Cartage*, 92 Ohio St.3d 115, 121-122, 748 N.E.2d 1111 (2001). A double recovery is precisely what King would get if he were able to sue one of his employers, CDP, for negligence after receiving workers' compensation benefits.

{¶ 35} King argues that *Hornyak v. Res. Alloys, LLC*, 8th Dist. Cuyahoga No. 104302, 2016-Ohio-8489, is "directly on point" with his case. In *Hornyak*, the Eighth District reversed summary judgment based on the record being unclear regarding which of several entities was the employer that contracted with the employment agency. *Id.* at ¶ 21-23. The court's decision was based on its interpretation of *Russell* as only allowing for two entities to claim immunity under R.C. 4123.74. As discussed, *Russell*'s holding

was not that narrow, so the factual similarities between this case and *Hornyak* do not require that we reach the same conclusion as the Eighth District.

{¶ 36} After considering the case law and the facts of this case, we find that CDP was King's employer for workers' compensation purposes, and, because *someone* paid workers' compensation premiums for King and King received workers' compensation benefits, the immunity granted by R.C. 4123.74 extends to CDP, and summary judgment in CDP's favor was appropriate.

## C. King failed to show that Buildtech had the intent to be liable in intentional tort.

{¶ 37} Under his second argument, King contends that the trial court erred by finding that (1) the hole King fell through was not "equipment," so that the rebuttable presumption of intent to injure under R.C. 2745.01(C) when an employer deliberately removes an equipment safety guard did not arise; and (2) Buildtech's failure to install guardrails around a hole on a construction site raises—at the least—a question of fact regarding Buildtech's intent to injure.

{¶ 38} Buildtech responds that King presented no evidence in the trial court showing that he "was injured in connection with a piece of equipment or that his injury involved removal of an equipment safety guard." Buildtech also argues that the release King signed in conjunction with the VSSR settlement released any intentional-tort claim that King might have against Buildtech. King did not address the issue of the release in

17.

his reply brief, but in the trial court, he argued that the language of the release only covers any further claims related to the VSSR application, and nothing more.

### 1. R.C. 2745.01(C) does not apply to King's case.

{¶ 39} Under R.C. 2745.01(A), an employer is not liable for damages resulting from an intentional tort committed during the course of a worker's employment unless the worker proves that the employer "committed the tortious act with the intent to injure another or with the belief that the injury was substantially certain to occur." "Substantially certain" means that the employer acted with "deliberate intent to cause an employee to suffer an injury * * *."  R.C. 2745.01(B).  If the worker's injury was caused by the employer's "[d]eliberate removal" of an "equipment safety guard," the worker is entitled to a rebuttable presumption that "the removal * * * was committed with intent to injure another * * *."  R.C. 2745.01(C).

{¶ 40} "[T]he General Assembly's intent in enacting R.C. 2745.01, as expressed particularly in 2745.01(B), is to permit recovery for employer intentional torts only when an employer acts with specific intent to cause an injury, subject to * * *" the rebuttable presumption in subsection (C).  *Kaminski v. Metal & Wire Prods. Co.*, 125 Ohio St.3d 250, 2010-Ohio-1027, 927 N.E.2d 1066, ¶ 56.  The General Assembly has not defined "equipment safety guard" or "deliberate removal" for purposes of R.C. 2745.01.  *Bliss v. Johns Manville*, 2021-Ohio-1673, 172 N.E.3d 1146, ¶ 29 (6th Dist.), *aff'd.*, Slip Opinion No. 2022-Ohio-4366, --- N.E.3d ----, citing *Fickle v. Conversion Techs. Internatl., Inc.*,

18.

6th Dist. Williams No. WM-10-016, 2011-Ohio-2960, ¶ 24. The Ohio Supreme Court has held that an "equipment safety guard" is "a device designed to shield the operator from exposure to or injury by a dangerous aspect *of the equipment * * *.*" (Emphasis added.) *Hewitt v. L.E. Myers Co.*, 134 Ohio St.3d 199, 2012-Ohio-5317, 981 N.E.2d 795, ¶ 2. Interpretation of an undefined statutory term—and whether something meets the definition of that term—is a matter of law, not a question of fact. *Bliss* at ¶ 29, citing *Fickle* at ¶ 25.

{¶ 41} The term "equipment" is significant in this case, and it is among the terms that the General Assembly has not defined. However, "[a] legislative body need not define every word it uses in an enactment." *State v. Dorso*, 4 Ohio St.3d 60, 62, 446 N.E.2d 449 (1983). "Undefined terms must simply be accorded their common, everyday meaning." *State v. Whites Landing Fisheries, LLC*, 2017-Ohio-4021, 91 N.E.3d 315, ¶ 14 (6th Dist.), citing *Dorso* at 62. To determine that common, everyday meaning, courts look to the dictionary. *Athens v. McClain*, 163 Ohio St.3d 61, 2020-Ohio-5146, 168 N.E.3d 411, ¶ 71 (Kennedy, J., concurring, in part, and dissenting, in part).

{¶ 42} "Equipment" means "[t]he articles or implements used for a specific purpose or activity (esp. a business operation)[,]" *Black's Law Dictionary* equipment (11th Ed.2019), or "the set of articles or physical resources serving to equip a person or thing: * * * the implements used in an operation or activity : apparatus[.]" *Merriam-Webster Dictionary Online* equipment. An "article" is "a particular item or thing[,]"

19.

*Black's* at article, and an "implement" is "a device used in the performance of a task : TOOL, UTENSIL[.]" *Merriam-Webster* at implement. An opening in the floor of a building does not fit within any of these definitions. In the circumstances of this case, the hole was not an article, implement, apparatus, tool, or utensil used for an activity; it was simply an opening that existed from the time old floorboards were removed until new boards were installed. This alone takes the issue of deliberate removal off the table.

{¶ 43} But on top of that, the Supreme Court has found that "[f]ree-standing items that serve as physical barriers between the employee and potential exposure to injury * * * are not 'an equipment safety guard' for purposes of R.C. 2745.01(C)." *Hewitt* at ¶ 26. In *Hewitt*, the "physical barriers between the employee and potential exposure to injury" were rubber gloves and sleeves, but the Supreme Court has also determined that nothing in R.C. 2745.01 indicates that "safety devices such as orange cones, reflective vests, and retractable gates can be considered 'an equipment safety guard' as that term is used in the statute." *Houdek v. ThyssenKrupp Materials N.A., Inc.*, 134 Ohio St.3d 491, 2012-Ohio-5685, 983 N.E.2d 1253, ¶ 27. Guardrails around an opening in the floor are akin to retractable gates and other "physical barriers between the employee and potential exposure to injury[,]" so, at best, any guardrails around the hole would have been "safety devices"—not an "equipment safety guard"—meaning that the presumption in R.C. 2745.01(C) does not apply to this case.

**2. King did not show that Buildtech had the requisite intent to injure.**

**{¶ 44}** Without the presumption in subsection (C), to prevail on an employer intentional tort, King must show that Buildtech had "the intent to injure another or [had] the belief that the injury was substantially certain to occur." R.C. 2745.01(B). Although the statute appears to present two avenues for an employee to prove an intentional tort, the definition of "substantially certain" in R.C. 2745.01(B) "equates 'substantially certain' with 'deliberate intent' to injure. Thus, the two options of proof [under R.C. 2745.01(A)] become: (1) the employer acted with intent to injure or (2) the employer acted with deliberate intent to injure. [W]hat appears at first glance as two distinct bases for liability is revealed on closer examination to be one and the same." (Brackets sic and internal quotations omitted.) *Hoyle v. DTJ Ents., Inc.*, 143 Ohio St.3d 197, 2015-Ohio-843, 36 N.E.3d 122, ¶ 10, citing *Kaminski*, 125 Ohio St.3d 250, 2010-Ohio-1027, 927 N.E.2d 1066, at ¶ 55; and *Rudisill v. Ford Motor Co.,* 709 F.3d 595, 602-603 (6th Cir.2013).

**{¶ 45}** To have intent to injure, an employer must do more than place the worker in a potentially dangerous situation; the worker must show evidence of the employer's intent. *Turner v. Dimex, LLC*, 2019-Ohio-4251, 147 N.E.3d 35, ¶ 38 (4th Dist.). The employer's conduct must also be something more than even the most egregious forms of negligence. *See Houdek* at ¶ 23, citing *Kaminski* at ¶ 100 ("[L]iability of the employer cannot * * * be stretched to include accidental injuries caused by the gross, wanton, willful, deliberate, intentional, reckless, culpable, or malicious negligence * * * or other

21.

misconduct of the employer short of a conscious and deliberate intent directed to the purpose of inflicting an injury." (Internal quotation omitted.)). If the employee cannot demonstrate the employer's deliberate intent to injure, he has the same status as any employee injured by the negligence of the employer, and must seek redress through the workers' compensation system. *Stetter v. R.J. Corman Derailment Servs., LLC*, 125 Ohio St.3d 280, 2010-Ohio-1029, 927 N.E.2d 1092, ¶ 66.

{¶ 46} Assuming in this case that the hole was, in fact, unguarded at the time King fell, there is nothing showing that Buildtech's failure to put up guardrails rose to the level of intent to injure. Although Buildtech placed King in a potentially dangerous situation by leaving an open hole where workers could potentially fall through it and instructing King to move wood to an area near the hole, there is no indication that Buildtech failed to place guardrails with the deliberate, specific intention of someone getting hurt.

{¶ 47} King relies on *Cantu v. Irondale Indus. Contrs., Inc.*, 6th Dist. Fulton No. F-11-018, 2012-Ohio-6057, to provide a definition of "substantially certain" that would potentially result in us finding that an issue of fact remains in his intentional tort claim. However, we believe that *Cantu* was wrongly decided. In that case, despite acknowledging the Supreme Court's recent holdings regarding intent in *Kaminski* and *Houdek*, we examined two treatises on general tort law[3] to formulate a definition of

---

[3] The *Cantu* court relied on Prosser & Keeton, *Law of Torts* Section 8, 35-36 (5th Ed.1984); and 1 Restatement of the Law 2d, Torts, Section 8A, at 15 (1965). These are the same two treatises that the Supreme Court relied on in *Jones*.

22.

"substantially certain" that was substantially similar to the definition that the Supreme Court used *before* the current version of R.C. 2745.01—which dramatically restricted the "substantially certain" definition—was enacted. *See Kaminski* at ¶ 25, citing *Jones v. VIP Dev. Co.*, 15 Ohio St.3d 90, 95, 472 N.E.2d 1046 (1984). As the First District observed when presented with an argument similar to King's,

> the court's holding in *Cantu* is directly contrary to the Ohio Supreme Court's pronouncements that R.C. 2745.01 requires the employee to show deliberate intent to injure. The legislature has unequivocally rejected the substantial-certainty standard that the *Cantu* court attempted to read into the statute. As the Ohio Supreme Court stated in *Houdek,* "an employer's 'knowingly permitting a hazardous work condition to exist [and] knowingly ordering employees to perform an extremely dangerous job * * * falls short of the kind of actual intention to injure that robs the injury of accident character.'" *Houdek,* 134 Ohio St.3d 491, 2012-Ohio-5685, 983 N.E.2d 1253, at ¶ 24, quoting 6 Larson, *Workers' Compensation Law*, Section 103.03, 103-7 to 103-8 (2001). *See Spangler v. Sensory Effects Powder Sys., Inc.,* N.D.Ohio No. 3:15 CV 75, 2015 WL 3466583, *1-2, 2015 U.S. Dist. LEXIS 70427, *2-4 (June 1, 2015).

(Brackets sic.) *Pastroumas v. UCL, Inc.*, 1st Dist. Hamilton No. C-150352, 2016-Ohio-4674, ¶ 32; *see also Ball v. MPW Indus. Servs., Inc.*, 2016-Ohio-5744, 60 N.E.3d 1279, ¶

23.

36-38 (5th Dist.). We have not had the opportunity to revisit our decision in *Cantu* in the decade since it was decided, but, upon review, we agree with the First District that our reasoning in *Cantu* is at odds with the Supreme Court's jurisprudence on the current version of R.C. 2745.01. Accordingly, we decline to follow *Cantu*.

{¶ 48} In the absence of the R.C. 2745.01(C) rebuttable presumption, and without some evidence of Buildtech's injurious intent, King cannot prove his intentional tort claim as a matter of law, and the trial court did not err by granting Buildtech's motion for summary judgment.

### 3. The issue of the VSSR release is moot.

{¶ 49} Because we have determined that CDP and Buildtech are entitled to summary judgment on King's claims against them, we need not address their argument that the release in King's VSSR settlement barred him from bringing these claims.

### III. Conclusion

{¶ 50} Based on the foregoing, the March 16, 2022 decision of the Lucas County Court of Common Pleas is affirmed. King is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Thomas J. Osowik, J.   _____
              JUDGE

Christine E. Mayle, J.

             _____
Myron C. Duhart, P.J.        JUDGE
CONCUR.

             _____
              JUDGE


This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.