[Cite as *Hunter v. Cole Tool & Die Co.*, 2023-Ohio-2131.]

COURT OF APPEALS
RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | | |
|---|---|---|
| ROGER HUNTER | : | JUDGES: |
| | : | Hon. W. Scott Gwin, P.J. |
| Plaintiff-Appellant | : | Hon. William B. Hoffman, J. |
| | : | Hon. Andrew J. King, J. |
| -vs- | : | |
| | : | |
| COLE TOOL & DIE COMPANY, ET AL. | : | Case No. 2022 CA 0059 |
| | : | |
| Defendants-Appellees | : | O P I N I O N |


CHARACTER OF PROCEEDING:     Appeal from the Court of Common
Pleas, Case No. 2021 CV 0223


JUDGMENT:                    Affirmed


DATE OF JUDGMENT:            June 27, 2023


APPEARANCES:

For Plaintiff-Appellant                For Defendants-Appellees

KEVIN J. BOISSONEAULT                  WILLIAM R. CREEDON
JONATHAN M. ASHTON                     MATTHEW D. GURBACH
1450 Arrowhead Drive                   100 South Third Street
Maumee, OH  43537                      Columbus, OH  43215

                                       JENNIFER R. HARMON
                                       3 North Main Street
                                       Suite 708
                                       Mansfield, OH  44902

*King, J.*

{¶ 1}   Plaintiff-Appellant, Roger Hunter, appeals the July 29, 2022 order of the Court of Common Pleas of Richland County, Ohio, granting summary judgment to Defendants-Appellees, Cole Tool & Die Company and Cole Tooling & Stamping.  We affirm the trial court.

### FACTS AND PROCEDURAL HISTORY

{¶ 2}   Hunter worked for appellees as a transfer operator on an 800-ton Verson press used to stamp metal blanks into parts.  The large press is operated by five employees stationed around the press; four employees, one at each station, place and remove metal parts and one employee operates the press controls.  Once the employees place the metal blanks in the machine, they step back behind a vertical "light curtain" and the control operator proceeds.  The light curtain sends down a continuous beam of light.  Here there is no dispute between the parties that it acts as a safety guard, designed to kill electrical power to the press if any part of the beam is broken by an employee.  If an employee walks through it, the press would immediately stop.  After the blanks are stamped, the employees return and transfer the parts to the next station to be stamped again.  Occasionally, the press creates imperfections on the metal parts known as burrs which need to be removed by hand.

{¶ 3}   On August 5, 2014, Hunter was standing at the rear of the machine with the control operator in the front.  The press was producing too many burrs, so maintenance was called.  The press could not be fixed and continued to produce burrs.  After Hunter transferred a stamped part from station one to station two, he reached into station two with his right hand to remove a burr when the press was activated, sucked his arm in, and crushed his hand.  It appeared to do this despite the installation of the light curtain.

{¶ 4} Based on his work-related injuries, Hunter requested and received workers' compensation benefits from the state of Ohio.

{¶ 5} On August 4, 2016, Hunter filed a complaint against appellees claiming an employer intentional tort. Hunter voluntarily dismissed his complaint without prejudice on January 4, 2018.

{¶ 6} On January 3, 2019, Hunter refiled his intentional tort complaint against appellees. The parties filed a stipulated notice of voluntary dismissal without prejudice on April 19, 2021.

{¶ 7} On May 10, 2021, Hunter refiled his intentional tort complaint against appellees. On June 1, 2022, appellees filed a motion for summary judgment, arguing there was no evidence that they specifically and/or deliberately intended to harm Hunter. By order filed July 29, 2022, the trial court agreed and granted the motion.[1]

{¶ 8} Hunter filed an appeal with the following assignment of error:

I

{¶ 9} "THE TRIAL COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT IN FAVOR OF COLE TOOL & DIE CO."

I

{¶ 10} In his sole assignment of error, Hunter claims the trial court erred in granting summary judgment to appellees. We disagree.

{¶ 11} Summary judgment motions are to be resolved in light of the dictates of Civ.R. 56. Regarding summary judgment, the Supreme Court stated the following in *State ex rel. Zimmerman v. Tompkins,* 75 Ohio St.3d 447, 448, 663 N.E.2d 639 (1996):

---

[1] Two John Doe defendants were also included in the judgment, but as noted by the trial court, were never identified nor served in the case.

Civ.R. 56(C) provides that before summary judgment may be granted, it must be determined that (1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made. *State ex. rel. Parsons v. Fleming* (1994), 68 Ohio St.3d 509, 511, 628 N.E.2d 1377, 1379, citing *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 472, 364 N.E.2d 267, 274.

{¶ 12} As an appellate court reviewing summary judgment motions, we must stand in place of the trial court and review summary judgments on the same standard and evidence as the trial court. *Smiddy v. The Wedding Party, Inc.,* 30 Ohio St.3d 35, 506 N.E.2d 212 (1987).

{¶ 13} As explained by this court in *Leech v. Schumaker,* 5th Dist. Richland No. 15CA56, 2015-Ohio-4444, ¶ 13:

It is well established the party seeking summary judgment bears the burden of demonstrating that no issues of material fact exist for trial. *Celotex Corp. v. Catrett* (1986), 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment is delineated in *Dresher v. Burt* (1996), 75 Ohio St.3d 280 at 293: " * * * a party

seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party." The record on summary judgment must be viewed in the light most favorable to the opposing party. *Williams v. First United Church of Christ* (1974), 37 Ohio St.2d 150.

{¶ 14} Hunter argues that his employer is liable for his injury under R.C. 2745.01(A) and (C).

{¶ 15} Section (A) creates liability only when "the employer committed the tortious act with the intent to injure another or with the belief that the injury was substantially certain to occur." Although this version of the statute is written in the disjunctive, a plaintiff

can prevail only if "the employer acted with the intent to cause injury." *Kaminski v. Metal & Wire Products Co.*, 125 Ohio St. 3d 250, 2010-Ohio-1027, 927 N.E.2d 1066, ¶ 55. Section (C) creates a rebuttable presumption that the removal of an "equipment safety guard" was "committed with intent to injure another." For the reasons explained below, both of Hunter's claims fail.

{¶ 16} This court has examined the history of intentional tort law in Ohio and analyzed R.C. 2745.01, Ohio's intentional tort law. *Ball v. MPW Industrial Services, Inc.,* 2016-Ohio-5744, 60 N.E.3d 1279, ¶ 30-32 (5th Dist.); *Breitenbach v. Double Z Construction Co.,* 2016-Ohio-1272, 63 N.E.3d 498, ¶27-35 (5th Dist.). In *Ball*, this court held that subsequent to the legislative change, either part of Section (A) requires a plaintiff to demonstrate that the employer acted with specific intent to injure. *Id.* at ¶ 34. This court also established that the questioned conduct must be beyond negligence, recklessness, and wantonness. *Id.*

{¶ 17} Hunter cites to a Sixth District case, *Cantu v. Irondale Industrial Contractors, Inc.,* 6th Dist. Fulton No. F-11-018, 2012-Ohio-6057, to sustain his argument that his employer had the requisite intent under R.C. 2745.01(A). But the *Ball* court already examined the *Cantu* case and noted the following at ¶ 36:

> In *Cantu*, the court distinguished between motive and intent, stating that the word "intent" is used to "denote that the actor desires to cause the consequences of his act, or that he believes that the consequences are substantially certain to occur or result from it." The *Cantu* court further stated that "[w]hen the legislature redefined 'substantially certain' to mean 'deliberate intent,' the only thing added to this equivalency was the adjective

'deliberate,' meaning 'to carefully consider * * * characterized by awareness of the consequences.' "  (Citations omitted.)

{¶ 18} Ultimately, the *Ball* court specifically declined to follow *Cantu,* and held "R.C. 2745.01 requires the employee to show the employer had a deliberate intent to injure, not that an injury was substantially certain to occur." *Ball* at ¶ 38.  The Sixth District recently revisited its decision in *Cantu* and also declined to follow it.  *King v. Buildtech Ltd. Construction Development,* 6th Dist. Lucas No. L-22-1088, 2023-Ohio-1092, ¶ 47.

{¶ 19} Moreover, five months prior to *Ball,* the *Breitenbach* court held: "Simply stated, R.C. § 2745.01 requires specific or deliberate intent to cause injury in order to recover on an employer intentional tort claim.  R.C. § 2745.01(C) establishes a rebuttable presumption that the employer intended to injure the worker if the employer deliberately removes a safety guard."  (Citation omitted.)  *Breitenbach* at ¶ 35.

{¶ 20} Consistent with the Supreme Court's and this court's precedent, Hunter must establish under section (A) that the employer acted with intent to injure.  The trial court had before it the deposition testimony of Hunter with twenty-one exhibits and the deposition testimony of Aaron Snyder, a maintenance technician for appellees, with one exhibit consisting of pictures of the press.  In his summary judgment brief, Hunter cited to the depositions of a W. Shepherd and a C. Ritchie, but neither deposition is listed on the docket as being filed; the trial court did not cite to either in its order.

{¶ 21} By order filed July 29, 2022, the trial court granted appellees' motion for summary judgment, concluding:

Construing the evidence most strongly in favor of Plaintiff, the Court finds that reasonable minds can come to but one conclusion and that conclusion is adverse to Plaintiff on his claim that the Defendants committed any tortious act with the intent to injure the Plaintiff, that the Defendants committed an act with the deliberate intent that the Plaintiff be injured, or that the Defendants deliberately removed any safety guard on the Verson Press.

{¶ 22} In reaching this conclusion, the trial court found Hunter did not present any evidence that 1) the light curtain was malfunctioning; 2) there were any issues with the light curtain on the day of the incident; 3) there was truly an issue with the condition of the light curtain or that appellees were aware of any issues with the placement of the light curtain; 4) appellees were aware of the burr issue or the supervisor instructed the workers to reach in and remove the burrs; 5) appellees had any intent to cause harm to him or any of its employees; 6) appellees pushed employees to work and produce faster than what was safe; 7) appellees disabled safety devices or encouraged employees to bypass, work around, or disable safety devices; 8) the safety devices present were malfunctioning or poorly maintained; and 9) there were any injuries prior to his injury that would have alerted appellees to any safety issues.

{¶ 23} We concur with the trial court's analysis that there is an absence of evidence that would permit Hunter to resist summary judgment in favor of his employer. To the contrary, reasonable minds could only conclude that summary judgment was appropriate in favor of the employer.

{¶ 24} Hunter's claim under section (C) likewise fails. During the summary judgment stage, Hunter argued appellees instructed him to work on the press "despite knowing that the safety guard [light curtain] was inoperative." Plaintiff's June 29, 2022 Memorandum in Opposition at 1. Appellees "had actual knowledge of the defect of the safety guard" and still ordered employees to work on the press. *Id.* at 1-2. Appellees knew the light curtain "was defective and effectively had been removed and nevertheless continued to order" the employees to use the press. *Id.* at 2.

{¶ 25} In his appellate brief, Hunter argues it somewhat differently. He claims appellees knew the light curtain ("equipment safety guard") did not function properly because "it did not always work and needed maintenance" and its positioning enabled employees to work inside the light curtain. Appellant's Brief at 1. Hunter argues the light curtain "was both malfunctioning and misplaced" and therefore appellees were "gambling with its employees' limbs." *Id.* at 2. Contrary to this assertion, there was evidence in the record that the light curtain was functioning before and after the incident.

{¶ 26} Maintenance technician Snyder testified following the incident, the area was "quarantined and locked down * * * to make sure nothing got disturbed." Snyder depo. at 15.[2] Immediately following the incident, Snyder tested the light curtain and it was functioning properly. *Id.* at 21-31, 41. Snyder opined Hunter's injury occurred when he was standing in between "the safe zone of the light curtains and the front of the press." *Id.* at 37. Snyder was not present when the incident occurred; he did not witness it. *Id.* at 14, 41. Snyder testified to the following (*Id.* at 42-43):

---

[2]We note the Snyder deposition transcript is devoid of page numbers; we have tried our best to cite to the correct page.

Q. Are you aware of any individuals indicating that the machine would cycle even though people were in the light curtains prior to this incident?

A. Yes.

Q. Tell me about that.

A. When people would complain about the light curtains being where they were at, they would say well, look. I can get this close and you can still hit it.

Q. Who would complain about that?

A. The operator. Well, the operators would do it as a - - well, it's kind of hearsay. The operators would just do it and not complain about it, but laugh about it.

Q. But they would tell you that they could get in between the light curtain - -

A. They could fit between the light curtain.

Q. And the - -

A. And the ram.

Q. And the ram prior to this incident involving Roger Hunter?

A. On all presses.

Q. On all presses, including the press that Roger Hunter was injured on, correct?

A. Correct.

{¶ 27} Snyder stated he told the employees they needed to be outside the light curtain while the press was running. *Id.* at 43. He did not think a new light curtain was needed; but he did not think it was safe for an employee to get in between the light curtain and the press, "[t]hat's why I instructed people not to go and play that game." *Id.* at 43-44. Snyder also told his boss, Bill Shepherd. *Id.* at 55. There is no evidence in the record to indicate if Shepherd was management or if Shepherd notified management. Snyder was upset about the operators getting in between the light curtain and the press "[b]ecause they were doing something that they could get hurt with and they knew it and it was a game to them." *Id.* It was just his thought that it was a game to them. *Id.* Snyder did not testify that the light curtain was improperly positioned or that it had been moved or disabled prior to the incident.

{¶ 28} In *Hewitt v. L.E. Myers Co.*, 134 Ohio St. 3d 199, 2012-Ohio-5317, 981 N.E.2d 795, the Supreme Court addressed what "deliberate removal" under section (C) means. The Supreme Court rejected that it encompasses situations where the employer disables, bypasses, or fails to train employees on the guard. *Id.* at ¶ 29. Instead, the Supreme Court held there must be a "deliberate decision to lift, push aside, take off, or otherwise eliminate that guard from the machine." *Id.* at ¶ 30. Thus, Hunter must demonstrate there was a deliberate decision to physically remove the light curtain.

{¶ 29} Instead, Hunter's testimony supports the conclusion that summary judgment was proper here. Hunter was aware that OSHA did not cite appellees for any violations regarding the position of the light curtain on the press. November 21, 2017 Hunter depo. at 67. Hunter did not have any information that the light curtain was placed in an improper location. *Id.* Right after the incident, Hunter claimed he was blocking the beam from the light curtain, and Dave Harmon, the president of the company, claimed

Hunter was inside the beam between the light curtain and the press. *Id.* at 114-115. During his deposition, when asked why did the injury occur, Hunter responded, "I have no idea." *Id.* at 142. When asked if he could "remember with that press or any other, ever being able to get behind the light curtain between the light curtain and the press and have it operate," Hunter stated, "I have no knowledge." *Id.*

{¶ 30} Hunter gave written statements seven and ten months after the incident and indicated "[e]ven though my body broke the beam of the light curtain, the press cycled and the top die came down on my right hand." Defendant's Deposition Exhibits 8 and 9. Over three years after the incident, although Hunter had previously claimed he was turned sideways to break the beam, he now asserts he was actually between the light curtain and the press because of Harmon's statement. It is this statement that Hunter relies on to assert appellees deliberately and intentionally injured him: "management knew that the beams, the light curtains were too far away from the dies, you could be inside of it and they chose to do nothing about it." November 14, 2017 Hunter depo. at 128-129.

{¶ 31} Hunter had alleged that the light curtain malfunctioned or the light curtain was placed in a way that he was able to be between the light curtain and the press. Hunter does not know how the incident occurred. He has not presented any evidence that the light curtain malfunctioned other than his inconsistent guesswork. Nor has Hunter demonstrated that the safety guard was physically removed, nor does he claim the light curtain was intentionally disabled. In fact, he never alleged appellees removed any guards on the press. This testimony, by itself or in conjunction with Synder's testimony, is insufficient to demonstrate that the employer deliberately and physically removed the light curtain. Accordingly, summary judgement in favor of the employer was appropriate.

{¶ 32} Hunter also appears to argue that when an employer knows employees are bypassing the equipment safety guard, that knowledge constitutes a deliberate removal. We disagree.

{¶ 33} Hunter testified management was reckless because his supervisor knew Hunter could be in between the light curtain and the press and did nothing about it. November 14, 2017 Hunter depo. at 92, 96. Hunter acknowledged when an employee is outside the light curtain and steps forward toward the press, the press stops; if an employee goes further toward the press and is now completely in front of the light beam, the press could not operate again because "you have to recycle it." *Id.* at 99. He never told anybody that the light curtain was "too far back" from the press. *Id.* at 127.

{¶ 34} Hunter also opined appellees intentionally intended to injure him because "management knew that the beams, the light curtains were too far away from the dies, you could be inside of it and they chose to do nothing about it." *Id.* at 128-129. By management, Hunter meant Harmon. November 21, 2017 Hunter depo. at 113. Hunter did not testify to any animosity or problems with management. November 14, 2017 Hunter depo. at 129. Hunter agreed no one at work ever threatened him, expressed hostility toward him, or had any reason to hurt him. November 21, 2017 Hunter depo. at 105.

{¶ 35} Irrespective of whether Harmon knew about employees bypassing the safety guard, *Hewitt* makes it clear this knowledge, combined with a failure to act, does not fall within in the scope of section (C), i.e., the employer deliberately intended to remove an equipment safety guard. Likewise, he has failed to produce sufficient evidence that his employer deliberately intended to injure him. Thus, Hunter has not met his

reciprocal burden to set forth specific facts showing there is a genuine issue for trial on his intentional tort claim under R.C. 2745.01.

{¶ 36} Upon review, we find the trial court did not err in granting summary judgment to appellees.

{¶ 37} The sole assignment of error is denied.

{¶ 38} The judgment of the Court of Common Pleas of Richland County, Ohio is hereby affirmed.

By King, J.

Gwin, P.J. and

Hoffman, J. concur.